UNITED STEELWORKERS OF AMER-
ICA; et al., Plaintiffs–Appellants,

v.

PHELPS DODGE CORPORATION, a
New York corporation; et al.,
Defendants–Appellees.

No. 86–2811.

United States Court of Appeals,
Ninth Circuit.

Argued En Banc and Submitted
Sept. 20, 1988.

Decided Jan. 18, 1989.

Bruce R. Lerner, Bredhoff & Kaiser,
Washington, D.C., for plaintiffs-appellants.

James G. Speer, Evans, Kitchel &
Jenckes, P.C., Phoenix, Ariz., for defend-
ants-appellees.

Before GOODWIN, Chief Judge,
WALLACE, TANG, SCHROEDER,
FLETCHER, NORRIS, REINHARDT,
BEEZER, THOMPSON and
O'SCANNLAIN, and TROTT, Circuit
Judges.

WALLACE, Circuit Judge:

Following a bitter strike, unions repre-
senting employees of a Phelps Dodge Cor-
poration facility (Phelps Dodge) and certain
individuals (collectively the Steelworkers)
sued Phelps Dodge, law enforcement offi-
cials and others for conspiracy to violate
the civil rights of the Steelworkers. After
dismissing some defendants, the district
court granted summary judgment for
Phelps Dodge, and judgment was entered
pursuant to Fed.R.Civ.P. 54(b). The Steel-
workers appealed, and a panel of this court
affirmed. The appeal was subsequently
taken en banc.

The district court had jurisdiction pursuant to 28 U.S.C. § 1343, and we have jurisdiction under 28 U.S.C. § 1291. We reverse the judgment of the district court and remand the action for further proceedings. The opinion of the three-judge panel, reported at 833 F.2d 804 (9th Cir.1987), is withdrawn.

I

The background of this appeal was succinctly stated in the panel opinion:

Phelps Dodge owns and operates a copper mine and milling plant in Ajo, a few miles south of Tucson. In 1983, the unions representing those employees went on strike. By all accounts the strike was bitter, dividing the town and resulting in violence by both strikers and non-strikers. Huge demonstrations and violent confrontations met the company's attempt to replace the strikers. In this explosive situation both Pima County Sheriff's Department Officers, and Arizona Public Safety Officers were called to Ajo.

During the strike, several strikers were arrested and charged with felonies. Bail was set at $15,000 for each. When they could not post bail they were jailed in nearby Tucson. Other strikers were arrested or cited and charged with misdemeanors.

The Steelworkers sued Phelps Dodge, Pima County, the Sheriff and individual Deputies, the Arizona Department of Public Safety and individual officers, individual attorneys of the County Attorney's Office, and the Ajo Justice of the Peace for conspiracy to deprive the strikers and their supporters of their constitutional rights in violation of 42 U.S.C. § 1983. They alleged discriminatory enforcement of the law, arrests without probable cause, and excessive bail.

The State Department of Public Safety and its officers, the Justice of the Peace, and the attorneys were dismissed. The district court then granted summary judgment and costs for Phelps Dodge. The Steelworkers appealed, contending that sufficient evidence of a conspiracy was presented to require a jury trial. *United Steelworkers of America v. Phelps Dodge Corp.*, 833 F.2d 804, 805 (9th Cir. 1987).

We review the entry of summary judgment independently. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). We are governed by the same standard used by the trial court under Fed.R.Civ.P. 56(c). *Id.* Under that standard, summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the crucial question before us is whether the evidence presented by the Steelworkers, together with permissible inferences drawn from that evidence, is sufficient to establish a "genuine issue as to any material fact."

II

■ The Steelworkers contend that a genuine issue exists as to whether Phelps Dodge was part of a conspiracy to deprive the strikers of their civil rights in violation of 42 U.S.C. § 1983. Actions may be brought pursuant to 42 U.S.C. § 1983 to redress constitutional violations under color of state law. Private parties act under color of state law if they willfully participate in joint action with state officials to deprive others of constitutional rights. *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970) (*Adickes*); *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966); *Fonda v. Gray*, 707 F.2d 435, 437 (9th Cir.1983) (*Fonda*). Private parties involved in such a conspiracy may be liable under section 1983. *Adickes*, 398 U.S. at 152, 90 S.Ct. at 1605.

■ To prove a conspiracy between the state and private parties under section 1983, the Steelworkers must show "an agreement or 'meeting of the minds' to

violate constitutional rights." *Fonda,* 707 F.2d at 438; *see Adickes,* 398 U.S. at 158, 90 S.Ct. at 1609. To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. *Fonda,* 707 F.2d at 438. Evidence that police failed to exercise independent judgment will support an inference of conspiracy with a private party. *See Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 435–36 (7th Cir.1986) (police agreement to arrest anyone designated by shopkeeper constitutes conspiracy), *cert. denied,* 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1352–53 (7th Cir.1985) (same).

Whether the Steelworkers have proven the existence of a conspiracy to deprive them of their civil rights is not before us. We assume for purposes of this appeal that such a conspiracy did exist and did violate their civil rights. We have before us only the narrow issue of whether the Steelworkers have alleged enough evidence that Phelps Dodge was in fact a participant in this conspiracy to defeat a motion for summary judgment. We first discuss the standard that the Steelworkers must satisfy to defeat a summary judgment motion. We then consider whether the Steelworkers have satisfied this standard.

### A.

The Steelworkers rely primarily on *Adickes.* The Court there concluded that unless the alleged conspirators foreclosed the possibility of a tacit agreement from which a conspiracy could be inferred, they were not entitled to summary judgment. 398 U.S. at 157, 90 S.Ct. at 1608. *Adickes* involved a white schoolteacher who was refused service in a public restaurant while in the company of several of her black students. As she left the restaurant, she was arrested for vagrancy by local police. Adickes brought a section 1983 claim against the restaurant, alleging that the refusal to serve her and her subsequent arrest were products of a conspiracy between a private individual (Kress) and a governmental entity (local police). The district court granted summary judgment against Adickes, ruling that she "failed to allege any facts from which a conspiracy might be inferred." *Adickes v. S.H. Kress & Co.,* 252 F.Supp. 140, 144 (S.D.N.Y.1966). The court of appeals affirmed. *Adickes v. S.H. Kress & Co.,* 409 F.2d 121, 126–27 (2d Cir.1968).

The Supreme Court reversed, ruling that the alleged conspirators had failed to negate inferences that could be drawn from the presence of a policeman inside the restaurant while Adickes was awaiting service. Although the store manager's deposition claimed that he had not seen or communicated with a policeman, there were no affidavits from two other employees present in the store at the time. Thus, Kress "did not carry its burden because of its failure to foreclose the possibility that there was a policeman in the Kress store while [Adickes] was awaiting service, and that this policeman reached an understanding with some Kress employee that [Adickes] not be served." *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. The Court held that there was circumstantial evidence of a conspiracy, and the "unexplained gaps" in the record were held against Kress because, as the moving party, it had the initial burden to show affirmative evidence of the nonexistence of a material fact in dispute. *Id.*

If the Supreme Court had given no further guidance, we would decide this appeal based on whether Phelps Dodge had foreclosed the possibility of the existence of facts from which an inference of conspiracy could be drawn. Phelps Dodge would have the burden of showing the absence of a genuine issue as to any material fact, and any unexplained gaps in the record would be held against it. *Id.* But the Supreme Court has given additional guidance in two subsequent decisions: *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (*Liberty Lobby* ), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (*Celotex* ).

In *Liberty Lobby,* the Court held that when a defendant moves for summary

judgment, the trial court must determine from the record whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." 477 U.S. at 252, 106 S.Ct. at 2512. The possibility that the plaintiff may discredit the defendant's testimony at trial is not enough for the plaintiff to defeat a properly presented motion, "the plaintiff need only present [affirmative] evidence from which a jury might return a verdict in his favor." *Id.* at 257, 106 S.Ct. at 2514. If from the evidence presented a jury could "reasonably find *either* that the plaintiff proved his case *or* that he did not," *id.* at 254, 106 S.Ct. at 2513 (emphasis in original), summary judgment must be denied.

*Liberty Lobby* focuses the district court's attention on the "actual quantum and quality of proof necessary to support liability" at trial. *Id.* Mere submission of affidavits opposing summary judgment is not enough; the court must consider whether the evidence presented in the affidavits is of sufficient caliber and quantity to support a jury verdict for the nonmovant. *Id.* A "*scintilla* of evidence," or evidence that is "merely colorable" or "not significantly probative," is not sufficient to present a genuine issue as to a material fact. *Id.* at 249–50, 252, 106 S.Ct. at 2510–11, 2512. The trial court, however, must keep in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge.... The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. A "justifiable inference" is not necessarily the most likely inference or the most persuasive inference. Rather, "an inference as to another material fact may be drawn in favor of the nonmoving party ... if it is 'rational' or 'reasonable.' " *T.W. Electrical Service v. Pacific Electrical Contractors*, 809 F.2d 626, 631 (9th Cir.1987) (*T.W. Electrical*). Of course, the inference drawn must be one permitted under the governing substantive law. *Id.* This approach to evaluating a summary judgment motion is similar to the inquiry courts make to determine the appropriateness of a di-

rected verdict pursuant to Fed.R.Civ.P. 50(a). *Liberty Lobby*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12.

As a defamation action, the substantive law in *Liberty Lobby* required the plaintiff to prove certain elements of its case with "clear-and-convincing evidence"—a heightened standard of proof. The approach announced by *Liberty Lobby* applies equally to "run-of-the-mill" civil cases which involve the preponderance-of-the-evidence standard. *Id.* at 252, 106 S.Ct. at 2512. Thus, *Liberty Lobby's* focus on the sufficiency of the evidence at trial applies to summary judgment motions in all civil cases, and not just those which, like *Liberty Lobby*, involve the heightened "clear-and-convincing evidence" standard. *Id.* at 252–53, 106 S.Ct. at 2512–13; *see, e.g., Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 922–23 (9th Cir.1987) (summary judgment appropriate if no reasonable juror could find for the plaintiff by a preponderance of the evidence (*citing Liberty Lobby*)). Indeed, the Court showed how conspiracy cases such as *Adickes* and *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), fall within the rule. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510–11; *see also T.W. Electrical*, 809 F.2d at 630–31 (applying *Liberty Lobby* rule to summary judgment motion in conspiracy case).

*Celotex* was decided the same day as *Liberty Lobby*. Whereas *Liberty Lobby* focused on the quantum and quality of evidence required to withstand summary judgment, *Celotex* emphasized the allocation of burdens of proof. The Court held that on an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support the plaintiff's claim. 477 U.S. at 322–23, 106 S.Ct. at 2552–53. The defendant is not required to produce evidence showing the absence of a genuine issue of material fact with respect to an issue where the plaintiff has the burden of proof. *Id.* at 325, 106 S.Ct. at 2554. Nor does Rule 56(c) require "that

the moving party support its motion with affidavits or other similar materials *negating* the nonmoving party's claim." *Id.* at 323, 106 S.Ct. at 2553 (emphasis in original).

In *Celotex,* the court of appeals had relied on *Adickes* to reverse the entry of summary judgment by the district court. The Court held that the *Adickes* language relied on by the court of appeals

> should [not] be construed to mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof. Instead, as we have explained, the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.

*Id.* at 325, 106 S.Ct. at 2554.

Here, the burden of proof was on the Steelworkers to prove that Phelps Dodge was a part of the conspiracy. Phelps Dodge, in moving for summary judgment, needed only point to shortfalls in the Steelworkers' case to demonstrate the absence of evidence connecting it to the conspiracy. The Steelworkers concede that Phelps Dodge met this responsibility in moving for summary judgment. Unless the Steelworkers presented sufficient evidence to demonstrate that there was a triable issue of fact as to Phelps Dodge's connection to the conspiracy, Phelps Dodge was entitled to summary judgment. We therefore must determine whether the Steelworkers presented "concrete evidence from which a reasonable jury could return a verdict in [their] favor." *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. at 2514.

### B.

The Steelworkers contend that their evidence is sufficient to raise a genuine issue as to Phelps Dodge's connection to the conspiracy, and thus defeat Phelps Dodge's summary judgment motion. Their argument rests on four principal lines of evidence: (1) Phelps Dodge's powerful position in the small community of Ajo, and its close relationship with law enforcement officials involved in the strike; (2) the August 11, 1983, meeting between Phelps Dodge executives and various law enforcement officials, and the events which followed the meeting; (3) the unequal treatment by law enforcement officials of strikers and strikebreakers; and (4) active contact and cooperation between Phelps Dodge and law enforcement officials during the strike. We review the evidence in the light most favorable to the Steelworkers. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir. 1986).

### 1.

The Steelworkers point to many aspects of Phelps Dodge's powerful position in the community of Ajo. Phelps Dodge is Ajo's predominant employer. Phelps Dodge owns most of the property in Ajo, including virtually all available rental housing. Through Phelps Dodge Mercantile Company (Phelps Dodge Mercantile), Phelps Dodge also operates a company store.

Many individuals who played a role in breaking up the strike had significant ties to Phelps Dodge. The Ajo Justice of the Peace, who issued the arrest warrants in this case, was on furlough from her job as a Phelps Dodge security guard and could have returned to this job at any time with full seniority. She obtained her judicial position through a nomination by Phelps Dodge's security chief. Her car bore the personalized license plates "PD AJO," which stood for "Phelps Dodge Ajo." Both Phelps Dodge and the Pima County Sheriff's Department (Sheriff's Department) employed her close relatives. She lived in housing rented from Phelps Dodge.

Numerous Sheriff's Department deputies likewise lived in houses or apartments rented from Phelps Dodge. Spouses and relatives of several deputies worked for Phelps Dodge and some worked as strikebreakers during the strike. Several deputies were former Phelps Dodge employees.

### 2.

The Steelworkers rely most heavily on a meeting which took place on August 11, 1983, at Phelps Dodge, as described in the deposition of Deputy Pima County Attorney Casteel. Those present at the meeting included Casteel, Sheriff Dupnik and Lieutenant Garchow of the Sheriff's Department, and Phelps Dodge's Plant Manager, Labor Relations Manager, and Director of Security. Two days before the meeting, strikers for the first time had blocked the entrances to the Phelps Dodge plant gate and mine gate, preventing any shift change for a period of 36 hours. The police ordered the road closed. On the day before the meeting, there was a near-confrontation between strikers and a large contingent of Sheriff's Department and Arizona Department of Public Safety officers. This incident led to negotiations between union leaders and Sheriff Dupnik resulting in a truce. Union leaders persuaded the strikers to disperse, and a shift change was permitted.

At the August 11 meeting, the Phelps Dodge representatives asked whether the police intended to take any action against the strikers who had damaged property and violated the law. Sheriff Dupnik responded that arrests would be made, although the police had not yet completed the list of those to be arrested, determined the charges, or secured the warrants. A Phelps Dodge representative asked about the bail for the strikers, and indicated that in view of the "circumstances" and "severity" of the charges, he hoped bond would be "set high." He said that he "wanted those people off the streets." At some point, Sheriff Dupnik said that he planned to request $15,000 bail for each striker. Sheriff Dupnik had a partial list of the strikers for whom he hoped to secure warrants. After the discussion of bail, Dupnik went over that list with the representatives of Phelps Dodge.

The Steelworkers argue that the meeting resulted in numerous irregularities that surrounded the arrests of certain strikers. They contend that in light of this meeting, the preparation of the warrants, the actual decision to arrest, and the setting of bail constitute important evidence which could support a finding of Phelps Dodge's connection to the conspiracy. For example, after the meeting at Phelps Dodge, Casteel met with three Sheriff's Department officers and, thereafter, she and two of these officers went to the office of the Justice of the Peace to obtain the warrants, based on complaints signed by a representative of the County Attorney. The justice made no probable cause determination, and received no sworn testimony from the officers. The warrants were nevertheless prepared, but held by the justice for two weeks, when she changed the date and then signed the warrants.

During the two weeks the justice held the warrants, there were no confrontations between strikers and police officers. Indeed, the police began reducing their forces, and the Pima County Attorney told the press that "we'd like to have things simmer down and not have to charge anyone with felonies" for the events of August 9.

Two days before the warrants were issued, Phelps Dodge lawyers and the Justice of the Peace entered the main Phelps Dodge office building within 20 minutes of each other. About an hour and a half later, the justice and certain police officers left, followed shortly by the lawyers.

Sheriff Dupnik met with the Phelps Dodge Manager and Director of Security at Phelps Dodge on the date the arrest warrants were issued or the day before. Phelps Dodge acknowledges that the purpose of the meeting was to discuss the arrests of the strikers. The date the warrants were issued is the sole day for which Phelps Dodge could not produce its log of daily contacts between its security officers and the Sheriff's Department.

The Justice of the Peace also followed unorthodox procedures in setting $15,000 bail for those arrested. She made no effort to individualize bail according to community ties, ownership of property in Ajo, ability to pay, likelihood of appearance, or whether an individual had turned himself in. Nor did she inquire, as she normally

would, whether the strength of the case against each individual warranted bail in that amount.

### 3.

The Steelworkers argue that evidence of different treatment by police of strikers and strikebreakers supports the inference of conspiracy between law enforcement officials and Phelps Dodge. The Steelworkers detail many examples of alleged disparity including inconsistent handling of telephone harassment claims, notably the furnishing of phone "grabbers" to trace calls made to strikebreakers but not to strikers; release on his own recognizance of a strikebreaker who committed an assault on a striker while burdensome bail was generally imposed on strikers; imposition of bail on strikers in excess of the maximum fine allowed for the misdemeanor charged; failure to investigate certain incidents involving use of guns by strikebreakers; failure to enforce traffic rules against strikebreakers; and failure to investigate and act on positive identification (by strikers) of strikebreakers engaged in public indecency and tire slashing.

### 4.

The Steelworkers also offered evidence of the close working relationship between Phelps Dodge and law enforcement personnel during the strike. These included regular radio contact between Phelps Dodge and other law enforcement personnel; sharing of intelligence; daily contact at the picket line area; and regular meetings. Phelps Dodge provided videotapes of strikers' activities to assist in identifying lawbreakers. Sheriff Dupnik stated that his department had a "close working relationship" with Phelps Dodge security personnel. In fact, when the strike began, Phelps Dodge Mercantile established a charge account for the Sheriff's Department so that deputies on temporary assignment to Ajo during the strike could charge their meals at the company store.

The Steelworkers also produced evidence indicating that police relied on Phelps Dodge security personnel for instruction as to where the strikers should be allowed to picket. Police followed the Phelps Dodge Security Manager's instructions not to enforce violations by strikebreakers of the stop sign outside the Phelps Dodge entrance. On the day that warrants to arrest strikers were issued, the police met with Phelps Dodge to discuss the arrests.

### III

The evidence presented, in the light most favorable to the Steelworkers would, if believed by a jury, be sufficient to prove close relations between Phelps Dodge and the state actors. The question is whether the jury could properly infer from these concrete facts that Phelps Dodge was a co-conspirator.

A court evaluating a summary judgment motion must consider all "justifiable" and "legitimate" inferences in the nonmoving party's favor. *Matsushita Electric v. Zenith Radio,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (*Matsushita*). Inferences may be drawn from underlying facts not in dispute such as background or contextual facts, as well as from disputed underlying facts which the judge must assume will be resolved at trial in favor of the nonmovant. *T.W. Electrical,* 809 F.2d at 631.

Phelps Dodge argues that it was confronted with a dangerous and potentially volatile situation requiring police protection. It contends that assisting the police in this protective effort is no violation of the Steelworkers' civil rights. We agree. Indeed, citizens are properly urged to cooperate with law enforcement agencies when crime or civil disobedience is threatened. As we made clear in *Arnold v. International Business Machines,* 637 F.2d 1350 (9th Cir.1981), such cooperation does not prove conspiratorial conduct. There, the company cooperated with the police in investigating the possible theft of documents by an employee. Meetings between the company and representatives of law enforcement agencies, the district attorney, and the attorney general occurred. A cooperative investigation resulted. We affirmed the entry of summary judgment by

the district court of the employee's action alleging a civil rights violation. We described the company's involvement as follows:

> It is undisputed that IBM had some involvement with the Task Force. The Task Force would not have existed but for IBM. IBM brought the information concerning possible criminal activity to the authorities. IBM turned over to the Task Force the information that it had gathered concerning the possible leaks of trade secrets during its own investigation. An IBM employee, Callahan, was a member of the Task Force. The Task Force relied heavily, perhaps exclusively, on IBM personnel in determining what information constituted trade secrets, and what documents were IBM documents. The district attorney relied on IBM attorneys to provide appropriate witnesses to testify before the grand jury. IBM supplied the Task Force with "buy money" to enable Bourget to purchase documents and information from the suspected thieves, while under surveillance. IBM also provided the Task Force with money for expenses incurred during the course of the investigation that could not be covered by the local budget. IBM also rented an airplane that was used by members of the Task Force for travel during the course of the investigation. It is clear that "but for" IBM's involvement, there would have been no investigation, and Arnold never would have been arrested or indicted or had his residence searched.

*Id.* at 1357. There was no evidence in *Arnold* "that would tend to show that [the company] had some control or power over the Task Force, [or] that [the company] directed the Task Force to take action against Arnold...." *Id.* at 1356. Yet, we concluded, summary judgment was proper.

■ Here, too, there is abundant evidence of cooperative involvement between Phelps Dodge and law enforcement agencies. The question is, is there more? We believe there is. Here, the conspiracy is admitted for purposes of this appeal. This conspiracy is the "smoking gun." The issue is whether the Steelworkers presented enough evidence for a reasonable jury to decide that Phelps Dodge helped pull the trigger.

At the August 11 meeting, Phelps Dodge did not merely agree to cooperate in an investigation. It did not merely provide the police with useful information. It did not merely ask that its gates be opened and its property and workers be protected. If that were all Phelps Dodge requested, this case would be like *Arnold*. Phelps Dodge, in contrast, wanted the police to arrest strikers and "keep them off the streets." A reasonable jury could infer that this was not a request to keep strikers off the street in front of the plant, but off "the streets" —all streets. Keeping strikers off all streets goes beyond protection of workers and property. It reflects an intent to punish the strikers. Nor is this all. Phelps Dodge further suggested that the police keep the strikers off the streets by setting high bail. A reasonable jury could infer that this reflects an intent to punish the strikers. This evidence is sufficient to satisfy the standard of *Liberty Lobby*. It is not just a "scintilla of evidence" or evidence that is "merely colorable" or "not significantly probative." *Liberty Lobby*, 477 U.S. at 249–50, 252, 106 S.Ct. at 2510–11, 2512. This evidence may be viewed as Phelps Dodge's own confession of its intent. It is unusually probative. It is not evidence of a collateral matter, but goes to the most critical issue in the case: whether Phelps Dodge intended to violate the strikers' civil rights. Moreover, this evidence takes on additional significance given that Phelps Dodge's requests came to fruition several weeks after the meeting. Based on this direct evidence, a jury could infer that Phelps Dodge was a participant in the conspiracy. Thus, this evidence is of the "quantum and quality of proof necessary to support liability" at trial. *Id.* at 254, 106 S.Ct. at 2513.

This direct and highly probative evidence makes the inferences that can be drawn from the abundant circumstantial evidence all the more "justifiable" and "legitimate." *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57. Phelps Dodge's powerful stat-

ure in Ajo, combined with its repeated contacts with the police, provide "undisputed background or contextual facts," *T.W. Electrical*, 809 F.2d at 631, from which the jury could legitimately draw inferences. The jury would be justified in inferring that Phelps Dodge had both the ability and the opportunity to conspire with the police. The ability and opportunity to conspire, while insufficient alone, constitute circumstantial evidence of actual participation in the conspiracy. *See Adickes*, 398 U.S. at 158, 90 S.Ct. at 1609. This circumstantial evidence does not stand alone, but rather serves to buttress the direct evidence and the permissible inferences arising from it.

The conduct of the Justice of the Peace in issuing warrants without probable cause immediately following the August 11 meeting might be capable of innocent interpretation. The peculiar timing and aberrant procedure surrounding the writing of the warrants, however, would support a justifiable inference of conspiracy. Moreover, the Justice of the Peace did not issue the warrants until after yet another meeting with Phelps Dodge attorneys at the Phelps Dodge plant. Although susceptible of innocent interpretation, this too would support a justifiable inference of conspiracy. The same may be said of the Justice of the Peace's unusual decision to set uniform bail.

The inferences that can be drawn from actions of the Justice of the Peace are bolstered by Phelps Dodge's viewing of the list of those Sheriff Dupnik planned to arrest, and its opportunity to offer its ideas on the composition of the list before the arrests occurred. This alone does not constitute sufficient evidence of conspiracy to defeat Phelps Dodge's summary judgment motion. Police may show a list of possible arrestees to a victim or witness for many innocent purposes. But an act done for a legitimate purpose in furtherance of a conspiracy may, together with other evidence, be evidence of a conspiratorial purpose. *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. at 99, 101, 87 L.Ed. 23 (1942).

The demonstrated disparate treatment of strikers and strikebreakers standing alone would not be sufficient evidence of a conspiracy. However, when viewed together with the other evidence offered by the Steelworkers, such evidence could also support an inference of conspiracy between Phelps Dodge and the police. The same can be said of the frequent contact between Phelps Dodge and the police. The deference to Phelps Dodge on where to permit picketing indicates Phelps Dodge's substantial influence on matters within police discretion.

The inferences that can be drawn from all of this direct and circumstantial evidence, taken together, are of sufficient "quantum and quality" to create a genuine issue of material fact, *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. at 2513: whether Phelps Dodge participated in the conspiracy. Phelps Dodge argues that all the facts are now presented and that there are no facts proving the conspiratorial connection. It is true that there was no specific admission by a representative of Phelps Dodge that Phelps Dodge was a conspirator. That evidence is seldom available. The disputed fact here will be proven, if it can be, by other direct and circumstantial evidence. *See Adickes*, 398 U.S. at 158, 90 S.Ct. at 1609; *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir.1979), *rev'd in part on other grounds* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *Crowe v. Lucas*, 595 F.2d 985, 993 (5th Cir.1979). Here, the direct and circumstantial evidence were sufficient to require the fact finder to make a decision. Whether the Steelworkers will succeed in proving their case will need to await a trial. We hold only that they may try to do so.

REVERSED.

TROTT, Circuit Judge, dissenting, in which BEEZER, Circuit Judge, joins in parts I, II, and III:

I write in dissent for four reasons. First, in my judgment, the majority's opinion does not adequately differentiate between conduct that *causes* other conduct, and an *agreement* to violate or to disregard the law. The latter, of course, is the essence of a conspiracy; the former is

not. I am concerned, with all due respect, that although the majority is clearly saying "conspiracy," it may nevertheless be thinking "causation."

Second, the majority, in arriving at its conclusion, gives too much importance to a handful of words spoken at a post-riot meeting attended by representatives of Phelps Dodge, command level of law enforcement, and the County Attorney's office. Phelps Dodge, in the shadow of considerable unrest and violence surrounding its attempt to keep its business open, not surprisingly asked at this meeting whether arrests would be made. When the answer was in the affirmative, Phelps Dodge opined that if so, bond should be set high enough to keep the arrestees off the street. Even viewed in the context of all the facts and circumstances surrounding this case, which apparently aren't enough collectively to carry the day, these words are hardly proof of a conspiratorial agreement.

Third, I am concerned that we improvidently create difficulties for people honestly attempting to work with public authorities to restore the rule of law during a public disorder.

And fourth, I am troubled by the manner in which we review the decision of the trial court, according no deference whatsoever to his view of the facts and the inferences that might be legitimately drawn therefrom.

## I

### Conspiracy v. Causation

Phelps Dodge is a private entity. It can be brought into this cause of action—which requires a showing of state action—only by proving that Phelps Dodge was part of a conspiracy, not merely that Phelps Dodge caused something to happen.

This is the teaching of *Fonda v. Gray,* 707 F.2d 435 (9th Cir.1983), in which we stated:

> Section 1983 actions may be brought to redress constitutional violations effected under color of state law. A private party may be considered to have acted under color of state law when it engages in a conspiracy or acts in concert with state agents to deprive one's constitutional rights. *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1156–57, 16 L.Ed. 2d 267, 272 (1966); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142, 151 (1970).

> \* \* \* \* \* \*

> To prove a conspiracy between private parties and the government under § 1983, *an agreement or 'meeting of the minds' to violate constitutional rights must be shown.* *Adickes, supra,* 398 U.S. at 152, 158, 90 S.Ct. at 1609, 26 L.Ed.2d at 151, 155.... While it is not necessary to prove that each participant in a conspiracy know the exact parameters of the plan, they must at least share the general conspiratorial objective.

*Fonda,* 707 F.2d at 437–38 (citations omitted) (emphasis added). Although the majority opinion pledges fidelity to *Fonda,* in its analysis it gives the appearance of marching to the beat of a different drummer.

The source of this problem is found in *Arnold v. International Business Machines,* 637 F.2d 1350, 1356–57 (9th Cir. 1981), where the analysis of the private party-state action issue was handled in terms of whether the private defendants "proximately caused" the constitutional deprivation. In so doing, the court in *Arnold* came to the correct result, but I believe respectfully that it did so by posing and answering the wrong question. The question was not whether IBM had "proximately caused" the constitutional deprivation, but whether IBM had *conspired* with the police to deprive the plaintiff of a constitutional right. The court in *Arnold* viewed the term "proximate cause" as virtually synonymous with "conspiracy," but the two are markedly different and are not susceptible of such a marriage. What gets lost in this union is the requirement of a conspiracy that it be shown that the parties entered into an *agreement* to violate or to disregard the law. The use of the term "proximate cause" in this context, therefore, may tend to lead one down the wrong

path with the wrong flashlight looking for the wrong quarry.

Under similar circumstances, the shared unlawful intent requirement was emphasized in *Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970):

Although this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow *reached an understanding* to deny Miss Adickes service in the Kress store, or to cause her subsequent arrest *because* she was a white person in the company of Negroes.

The involvement of a state official in *such a conspiracy* plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or lawful.... Moreover, a private party involved in *such a conspiracy*, even though not an official of the State, can be liable under § 1983. 'Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.'

*Adickes*, 398 U.S. at 152, 90 S.Ct. at 1605–06 (citations omitted) (emphasis added).

E. Devitt, C. Blackmar & M. Wolff, *Federal Jury Practice and Instructions* § 103.23 (4th ed. 1987) (Devitt, Blackmar & Wolff) sets forth the test for determining whether certain evidence proves the existence of a conspiracy under these circumstances. This is a test carefully distilled from controlling case law. The pertinent jury instruction reads in relevant part as follows:

## § 103.23 Conspiracy to Interfere With Civil Rights—Existence of a Conspiracy

A conspiracy is a combination of two or more persons, by concerted action to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means. So, a conspiracy is a kind of partnership, in which each member becomes the agent of every other member. *The essence of a conspiracy is a combination or agreement to violate or to disregard the law.*

Mere similarity of conduct among various persons and the fact that they may have associated with each other and may have assembled together and may have discussed some common aims and interests, is not necessarily proof of the existence of a conspiracy.

However, the evidence in the case need not show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished. In order to establish that a conspiracy existed, the plaintiff must show that members of the conspiracy in some way or manner, or through some contrivance, positively or tacitly came to a *mutual understanding to try to accomplish a common and unlawful plan.*

The evidence in the case need not show that all the means or methods set forth in the plaintiff's complaint were agreed upon to carry out the alleged conspiracy, nor that all means or methods which were agreed upon were actually used or put into operation; nor that all persons alleged to have been members of the claimed conspiracy were members of said conspiracy.

\*　　\*　　\*　　\*　　\*　　\*

One may become a member of a conspiracy without full knowledge of all the details of the conspiracy. On the other hand, a person who has no knowledge of a conspiracy but who happens to act in a way which furthers some object or pur-

pose of the conspiracy does not thereby become a conspirator.

Before the jury may find that a defendant has become a member of a conspiracy, it must be shown by a preponderance of the evidence that the conspiracy was knowingly formed, and that the defendant who is claimed to have been a member *knowingly participated* in the unlawful plan *with the intent to advance or further some object or purpose of the conspiracy.* To act or participate knowingly means to act or participate voluntarily and intentionally and not because of mistake, accident or other innocent reason. [Emphasis added].

Webster's Third New International Dictionary (1976) defines "concerted" as something that is "mutually contrived or planned: agreed on."

The term "proximate cause" is nowhere to be found in this instruction, and the reason for its absence is simple: It doesn't belong there.[1]

The record in this case amply and without ambiguity supports the proposition that law enforcement in Arizona reacted directly to perceived pressure from Phelps Dodge, and they may have so reacted because this was a "company town." Cause and effect are shown, but that is all. As I assess them, the so-called inferences of an "agreement to violate or to disregard the law" in this case are wholly insubstantial and fall into the category of surmise and conjecture. Notwithstanding the array of facts set forth by the majority, the evidence of such an "agreement" is merely colorable. The facts simply do not reveal "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. U.S.*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946) (describing the term "conspiracy" in an antitrust context). *But*, if one is looking for *proximate cause,* one might surely believe,

when examining the inferences in this case, that a conspiracy has been spotted.

## II

### *The Non–Smoking Words*

After two years of discovery, approximately 90 depositions, answers to numerous sets of interrogatories, and extensive argument on the issue, the district court concluded that the specific facts and circumstances adduced by the Steelworkers in response to Phelps Dodge's motion for summary judgment failed to connect Phelps Dodge to a conspiracy. Not a shred of direct evidence of a conspiracy was found anywhere. It can only be concluded that the district court judge determined from the record *as a whole* that "a fair-minded jury could not return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Nevertheless, the majority finds a handful of very predictable words spoken by a party who viewed itself as the victim of continuing criminal conduct to have enough leverage to convert the relationship between Phelps Dodge and certain public officials into a conspiracy. I find this to be nothing more than a theory without proof.

Without passing on the constitutionality of his actions, the true import of the words "keep them off the streets" and the talk of high bail is illuminated when one reads Sheriff Clarence Dupnik's explanation of the process by which high bonds were recommended for persons arrested. The following is but a small portion of his deposition that gives his view of the challenge with which he was confronted:

"Q Did you meet with [Department of Public Safety] officers on August 9th?

"A. Yes.

"Q. Did you meet with a Colonel Thompson?

---

1. I note that the Manual of Model Jury Instructions for the Ninth Circuit (1985 Edition) does not contain a similar instruction. Instead, at page 243 it refers textually to *Arnold* and its requirement to show proximate or legal causation. Certainly there is an appropriate role in these lawsuits for causation. But that role first requires that a conspiracy be established. *Then* the issue is whether the damages complained of were caused by that conspiracy. See Devitt, Blackmar & Wolff, § 103.22 and § 103.25.

"A. Yes.

"Q. What was discussed at that meeting?

"A. We did develop a plan to deal with the problem.

"Q. Was part of that plan to declare the strikers an unlawful assembly?

"A. Yes.

"Q. That was to be done the following day?

"A. Yes.

"Q. Were there any conditions under which that was to be done?

"A. Yes.

"Q. What were those conditions?

"A. Well, I don't recall them specifically, but *we had a deputy County Attorney with us during the meeting, and it was his responsibility to see that we accomplished that objective in a legal fashion.* I don't recall the specifics of how we did it, but Major Douglas ultimately was the one who read a document to them in the manner outlined to us by the County Attorney's Office.

"Q. Who was the deputy County Attorney, if you recall?

"A. I don't recall.

"Q. Was there any discussion at that meeting with DPS as to the resources they would have available?

"A. Yes.

"Q. What did they tell you?

"A. I don't recall, but it was, as I recall, they provided about a hundred people.

"Q. Was there any discussion at that meeting of attempts to, that could be made to diffuse the situation?

.    .    .    .    .

"Q. Do you recall any discussions regarding the arrests for people involved on August 9th, during the days immediately around August 9th?

"A. Well, that was a subject of discussion generally at most meetings, so I can't honestly say that it was on that particular date, or whether it wasn't, but I can say that on the 9th of August we decided to change our posture, because of the problem that we were confronted with, and where we had assumed a posture of extreme tolerance, trying to be as inconspicuous and as subtle as we could, we felt that if we continued in that posture that it would only aggravate the problem that now we had to change posture more towards demonstrating that we were going to enforce law and order.

"Q. Did you—

"A. *That that would result in the greatest possibility that we wouldn't have physical violence and injury and bloodshed.*

"Q. Did you convey that change of policy to Lieutenant Garchow?

"A. Well, I'm sure that I did.

"Q. To others who were responsible for the Ajo area?

"A. No question about it. We were confronted by rumors that the strikers had guns and they were going to shoot, and our people were very edgy, and we had a very nasty situation, and I think had we not handled, *in hindsight we can speculate however we choose, but I think basically that our, the way that we handled it resulted in no violence, basically, or bloodshed occurring, essentially.*

"Q. Do you know if DPS was involved in discussions with respect to the change in policy?

"A. No, because they were merely acting in a support capacity to us. *We were making the decisions.*

.    .    .    .    .

"Q. If, in fact, there were several arrests made on August 11th of strikers for strike related charges, do you know why that would, the same policy would not be pursued for those who were to be charged for August 9th?

"A. Well, our policy, as I told you, changed from a reactive to a proactive posture, and as I recall, without being specific, our instructions were we're not going to tolerate illegal behavior if we can take action without being the catalyst for creating a problem. If we can arrest somebody

without causing a problem, who is obviously violating the law, then we're going to do that. We need to take a posture that we're not going to tolerate violations of the law, don't care whether they are strikers or non-strikers or who. We felt that we needed to establish ourselves in the community. *We felt that we had lost control and we had to regain it.*

"Q. Did that policy also apply to acts officers had witnessed on August 9th?

"A. You mean retroactively?

.     .     .     .     .

"Q. Yes. Did it apply retroactively to the things that had occurred that morning?

"A. No. No.

"Q. Why not?

"A. Well, first of all, we weren't in the position of going out and making any kind of arrests retroactively. We were dealing with an emergency.

.     .     .     .     .

"Q. (By Mr. McCrory) When did you first become aware of the amount of bail that was to be set on the warrants?

"A. On the day that they made the arrests.

"Q. Prior to that day, had anyone talked to you, any of your officers, about what recommendations should be made regarding bail?

"A. I talked to them.

"Q. What did you discuss with them?

"A. *I told them that we should seek bonds high enough—what I was afraid—we were anticipating all the different kinds of things that might happen.* We were still very edgy about making the arrests. *What I didn't want to happen was to go out into the community and arrest a dozen people on felony charges, bring them to the Ajo station, which isn't equipped to handle a dozen felony cases, and have a log of people at the Ajo station, and have those people released within five minutes,* you know, real angry, back into the community when the tension level is still pretty high. So I thought if we could get a reasonably high bond without mentioning any amounts—*I never dis-*

*cussed amounts, that's up to the judge—but to make our feelings known to the prosecutor that we would like to seek a high bond for strategy reasons,* so that these people couldn't get out in five minutes back onto the streets, I asked them to do that." (Emphasis added). [ER].

The "off the street" language from Phelps Dodge to which the majority attaches so much importance loses its conspiratorial impact when read in the context of the Sheriff's explanation of his actions and when viewed in the light of his affidavit filed as Exhibit 7 in support of the motion for summary judgment. In that affidavit, Sheriff Dupnik stated:

9. All decisions with regard to the strike in Ajo that I have made in my professional capacity as Sheriff of Pima County ultimately have been my decisions reached by the exercise of my independent judgment and for the sole purpose of applying and enforcing the law in an impartial manner. No one, including PD [Phelps Dodge], the Department of Public Safety (DPS), the Pima County Attorney's Office (PCAO) or any justice of the peace, has attempted to impair or prevent this process.

[ER 094].

Three words end up being the difference in this case. In the view of the majority, these words—"off the streets"—uttered in connection with a request for high bail become the ultimate basis for an inference of an intent unlawfully to punish the strikers and an "*agreement* to violate or to disregard the law." The majority even adds an interpretation to these words—"*all* streets"—that with all respect is unsupported and strikes me as grasping at straws.

As to the other circumstances to which the majority points to substantiate its view that somewhere during all of this Phelps Dodge and some unidentified state actor consummated an invisible agreement amounting to a conspiracy, these too amount to little more than fodder for speculation. Yes, these circumstances existed,

but where's the agreement? Where's the beef?

Each of these circumstances is admittedly capable of innocent interpretation, yet they are added up so that the whole assumes greater probative value than its aggregate parts. This appears to be rationalized with the frequently stated but mistaken belief that direct evidence of a conspiracy is "seldom available." It is correct to say that such evidence is frequently not available, but it is inaccurate to say that it is "seldom available." The problem with the "seldom available" analysis is that it begins to sound like a rule of necessity that forgives a litigant's failure to prove his case; and as I point out in Section III, this is not an appropriate setting in which to invite such a relaxed approach to the proof of critical facts.

It is with good reason that we do not permit conjecture, surmise, or speculation to determine the results in lawsuits. Such adventures of the mind have a tendency to be unreliable. They may serve many valid purposes in everyday life, as does hearsay. But when it comes to the law and proof of an allegation, we require more, and correctly so. Conjecture in the context of proof of facts is outside the channels of careful, rational, discriminating thinking—which is the tool by which lawyers, judges and factfinders should be guided. This is a lawsuit we are dealing with, not the interpretation of a painting. We should not be inclined to arrive at or adopt conclusions based on theory rather than demonstration. This is precisely what motions for summary judgment are designed to weed out: lawsuits based on theory without proof. Does all of this evidence add up to "state action" on the part of Phelps Dodge? I think not.

### III

### *The Fallout*

The crucial distinction between being part of a concatenation and being a member of a conspiracy is of great importance in this particular setting. We are dealing not with a group of drug peddlers, bank robbers, swindlers, or klansmen, but with a legal entity that viewed itself—rightly or wrongly—as the victim of continuing criminal conduct.

First, this setting itself makes it questionable at best to infer an agreement "to violate or to disregard the law" from anything other than reasonably clear evidence. Such an inference as to the required unlawful state of mind is usually not difficult where the object of the conspiracy is patently illegal, such as in the case of drug peddling, etc.; but when the object of the agreement has an equally plausible lawful objective—and indeed one that is laudable—great care should be taken before imputing a conspiratorial state of mind to the parties.

Second, Phelps Dodge's approach to the proper authorities, as opposed to relying on self-help, should be encouraged. The majority makes this same point very clearly. But, by attaching special significance to one person's articulated wish at the resulting meeting with law enforcement to "keep them off the streets," and "set high bail," the majority effectively pays little more than lip service to this principle by creating a serious problem for anyone similarly situated who feels aggrieved enough to go to the police for help. There is hardly a victim in America who has not at some point uttered similar words. If the police, after hearing such words, go out and violate a protester's rights, is this sufficient without more to support a jury verdict of conspiracy between the "victim" and the police? This is precisely the kind of danger warned against by the Supreme Court in *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) when it said:

> In *Monsanto [Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)] we emphasized that courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct. *Monsanto*, 465 U.S. at 762–764, 79 L.Ed.2d 775, 104 S.Ct. at 1470–71.

[ ] Thus, mistaken inferences in cases such as this one are especially costly,

because they chill the very conduct the antitrust laws are designed to protect. *See Monsanto, supra,* at 763–764, 79 L.Ed.2d 775, 104 S.Ct. at 1470–71. '[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition.'

475 U.S. at 593–94, 106 S.Ct. at 1360.

I fear we chill the laudable goal of encouraging people to work appropriately with law enforcement in any matter involving a disturbance or continuing problem. If demonstrators take over a school, a government building, a hospital, a medical clinic, a church, a power plant or whatever, and the people responsible for the facility make what is, after this opinion, the mistake of saying "we want these people out of our building and carted off to jail with high bail," will this without more be sufficient to justify a jury verdict of conspiring to violate the protesters' rights if the police stumble and make a bad arrest or if a magistrate sets an improper amount on a bond? If a sheriff succumbs to pressure from a citizens' group against drunk driving and sets up a road block that is later ruled to be unconstitutional, are the citizens co-conspirators? What will a sheriff do in a meeting with a similarly aggrieved group when one of the group utters "get 'em off the streets" language? To the extent that we are obliged to give guidance so citizens can follow the law, we may be creating quicksand where there should be a firm footing.

## IV

### The Standards of Review

Finally, I am troubled by the standard of review applied by the majority. It seems that in failing to grant any deference whatsoever to the trial judge, we effectively undermine the Supreme Court's holdings in *Celotex,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Liberty Lobby* and particularly *Matsushita.* In *Celotex,* one reason the Supreme Court accepted the case was because of the view of a dissenting panel judge that the majority decision "un-

dermines the traditional authority of trial judges to grant summary judgment in meritless cases." *Id.* at p. 322, 106 S.Ct. at 2552.

In *Liberty Lobby,* the Supreme Court reprinted a similar message from *Schuylkill & Dauphin Improvement Co. v. Munson,* 14 Wall. 442, 448 (1872):

Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed. (Footnotes omitted.)

And, in *Matsushita,* the Court gives every appearance of rejecting second-guessing by an appellate court of a trial court's view of the facts.

I do not advocate abdicating our responsibility to insure a litigant is not improperly deprived of his right to a trial by jury, but a trial judge in cases such as this is in a far superior position to make judgments that deal with the *facts,* and especially inferences. This judge lived with this case for a considerable period of time. I note that the record now fills up four large boxes and weighs 87 pounds, and this does not cover most of the depositions that by stipulation remained with the parties. Under traditional principles of standard of review jurisprudence, it would appear that the concerns of judicial administration favor the perspective of a trial judge with respect to facts and inferences. Matters of law and mixed matters of fact and law (weighing heavily on the law side) are one thing, but

defects of fact in the sense that a party has no evidentiary support for an essential element of the case are another—even though constitutional rights are at stake. I am not offended by a more discerning multi-faceted standard of review that would find room for a trial court's perspective under these circumstances. It may be that the "clearly erroneous" standard would be appropriate as applied to such matters.

I think we engage in a practice that is the equivalent of what Judge Norris warned against in *U.S. v. McConney,* 728 F.2d 1195 (9th Cir.1984) (Norris, J., dissenting), when he said, "What the majority does is what an appellate court has no business doing: curing a defect in a ... case by gratuitously filling in gaps in the evidentiary record." *Id.* at 1213.

I would affirm.