**Clyde L. ERWIN, Plaintiff,**

v.

**BANK OF MISSISSIPPI, Defendant.**

**No. WC 80-17-WK-O.**

United States District Court,
N. D. Mississippi, W. D.

Jan. 29, 1981.

Will R. Ford, New Albany, Miss., for plaintiff.

E. Grady Jolly and T. Hunt Cole, Jackson, Miss., for defendant.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

In this action brought under the Age Discrimination in Employment Act (29 U.S.C. § 621 et seq.), Clyde Erwin, age 50 at the time the complaint was filed, sues the Bank of Mississippi alleging unlawful discharge and discrimination with respect to compensation, terms, conditions, and privileges of employment on account of age. Having found jurisdictional prerequisites to suit were satisfied, the court conducted a five-day evidentiary hearing and requested the parties to submit post-trial proposed findings of fact and conclusions of law.

That having been done, the case is now ripe for decision, and the court herein incorporates findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

## BACKGROUND

The Bank of Mississippi is a banking corporation with headquarters located in Tupelo, Mississippi. System-wide, the defendant has community banks located in 18 different towns and cities in north Mississippi and employs approximately 500 persons.

Erwin, then age 44, was hired by the bank at the Tupelo main office on January 20, 1974, as the bank's Training Coordinator at an annual salary of approximately $12,-400. Erwin gave his date of birth on the completed application form as requested. Prior to this employment, Erwin's main occupation was teaching business courses at various colleges and universities. Erwin had approximately 12 years teaching experience at the college level, having taught at five different colleges. He was never forced to leave the faculty of any college; rather, the reason for his several changes of college employers was the result of his dissatisfaction with certain colleges or failure of the colleges to renew one-year contracts because of his lack of desire to earn a doctorate degree. Erwin had a Masters in Business Administration and had earned 44 hours toward his doctorate.

Prior to Erwin's employ, the bank had no full-time training program and hence no training coordinator. He initially devised a questionnaire to all bank employees to ascertain training needs and prepared job descriptions for all positions. Erwin's principal ongoing duties included planning and scheduling all in-bank training programs and seminars for employees, coordinating all area courses of the American Institute of Banking (AIB), an organization participated in by many independent regional banks which sponsored continuing banking educational activities for bank employees, developing and maintaining bank organization and policy manuals, and encouraging employee participation in education and self-growth programs. Most of the training courses were taught by experts on particular subjects brought in from outside of the Tupelo community; some, however, were taught by Erwin.

Upon his employment by the bank, Erwin's immediate supervisor was the bank's comptroller, Robert Ross. After Ross left the bank in January 1977, Erwin, for a short time, reported directly to J. C. Whitehead, the bank's Board Chairman and Chief Executive Officer. In November 1977, Erwin was again placed under the supervision of the comptroller, at that time Nash Allen. Due to organizational changes occurring in late 1978, the comptroller and bank personnel functions were separated; Erwin was then placed under the direct supervision of the newly-created Human Resources Director. On January 1, 1979, Harold Altom assumed the position of Human Resources Director and remained Erwin's supervisor until May 24, 1979, when Erwin was finally relieved of all duties concerning the bank. Because of these various changes in supervision, a breakdown of Erwin's employment periods by supervisors is in order.

### THE ROSS YEARS (1975 to 1977)

Since Ross was not called to testify at trial, his appraisal of Erwin's work can be ascertained only by documentary evidence placed in the record. On June 21, 1974, Ross recommended that Erwin be given a salary increase of $66.67 per month. Ross stated his reasons for suggesting this raise as follows:

> Clyde has accomplished a great deal as training coordinator. Since joining the bank staff, he has been instrumental in the establishment of a supervisory training course and technical training sessions. He designed and conducted a survey to determine individual educational development needs and desires. He has promoted the AIB program and is currently working to help get the Ole Miss MBA program underway.

The salary recommendation was approved by the executive committee on June 25.

Ross' June 21, 1974, performance rating of Erwin evaluated Erwin's overall job performance as "above average." He was rat-

ed "average" in the "initiative" category, with Ross stating that "[i]mprovement is being made in this area; time will correct" and the "job attitude" category, comments being "this area needs to be strengthened—progress is being made." Ross found the following to be Erwin's most serious limitation: "Because of background, more technical orientation to banking industry will be helpful." Ross also stated that the bank should "work with [Erwin] in attaining more banking knowledge so he can better work with Bank officials.". As to Erwin's improvement, it was suggested that he "devote as much of own time [sic] to self-development and improvement of banking knowledge." Ross summarized his review of his evaluation of Erwin as follows:

> Clyde seemed to understand my explanation concerning the rating. Feels that his full potential is not being utilized in present position. Too much of his time devoted to clerical type work. I told him to seek more support in this area.

On January 10, 1975, Ross sent a memorandum to Whitehead recommending that Erwin be promoted to officer status with an increased salary from $13,800 to $15,000. Ross stated that Erwin was "eminently qualified for the position of training officer in our Bank;" that "he has developed the supervisory management course that has been quite successful;" that he "coordinated the technical training sessions that have recently been concluded;" that he "promoted a vigorous AIB program not only for our Bank, but for other banks in Northeast Mississippi as well;" and that "Clyde has been very conscientious in orienting himself to the banking profession. He has completed AIB courses in Principles of Bank Operations and Credit Administration since joining our staff." Ross concluded that "Clyde is a devoted employee of the Bank of Mississippi and is worthy of this recognition." The executive committee approved Ross' recommendation, and Erwin was promoted to the position of Training Officer effective January 1, 1975.

Ross' overall performance appraisal of Erwin's work in 1975 was "satisfactory." In his report dated January 12, 1976, Ross

commented that Erwin should "constantly strive to improve the Bank's training program. Be creative and aggressive—seeking and selling training programs." He also noted that Erwin was obtaining "very limited" experience which would provide preparation for advancement, recommending that Erwin "put forth more effort to learn about all aspects of banking through AIB courses and banking schools" and that "more can and needs to be done in Bank's training program and organizational development area before additional responsibilities can be assigned." Erwin was rated only "fair" in the area of "delegation" but was given a satisfactory or better rating in all other categories. Ross stated that he felt Erwin was well suited for his position. No review of Erwin's performance was conducted for the year 1976.

As alluded to in some of Ross' remarks, Erwin was very involved in the AIB. As a matter of fact, Erwin organized the AIB Tupelo Chapter in 1976 and was its first president.

### THE WHITEHEAD AND ALLEN YEARS (1977 to 1979)

As previously noted, Erwin was under the direct supervision of board chairman Whitehead from January 1977 until December 1977. Whitehead, age 59, testified that he had little contact with Erwin during this time because of Whitehead's other duties. Unable to adequately supervise Erwin, Whitehead in December 1977 placed Erwin under the direct supervision of Nash Allen, the comptroller. Although Allen, age 36, was Erwin's supervisor for only one month in 1977, they had worked in the same office before he undertook the supervision, and Allen had regular contact with Erwin and opportunity to observe his activities. Allen prepared the 1977 performance appraisal of Erwin at Whitehead's request. Erwin was given a "satisfactory" rating, although Allen noted that he did not think Erwin was well suited for his position, stating "at the present time I think Clyde needs more of a banking background in order to effectively perform his job," and that Erwin "needs to

develop a greater understanding of the practical applications of banking." Allen did note, however, that Erwin was then enrolled in the graduate school of banking at the University of Wisconsin.

During 1977 Erwin received AIB standard, general and advanced certificates and was complimented by Whitehead on these achievements. The advanced certificate is the highest certificate awarded by the AIB. Erwin was also complimented by several employees on his teaching of courses. In the bank's 1976 Annual Report, published in 1977, it is stated:

. A formal training department established three years ago has developed into one of our major sources of trained bankers.

Through the Bank's management training program, young college graduates enter a formal training program to acquaint them with the everyday working and practical aspects of banking. Their exposure to banking procedures by experienced bank employees is equally important to our exposure to new and innovative ideas brought into banking by these college trained specialists.

The 1977 annual report also praised the training program and concluded "you can readily understand why we feel Bank of Mississippi bankers are the best-educated, most professionally trained bankers in North Mississippi."

Allen's 1978 performance appraisal rated Erwin's overall performance as "satisfactory." Allen answered "yes" to the question regarding whether Erwin was well suited for this position, but commented "this is a qualified 'yes.' More practical banking experience would better qualify individual for the job." Erwin was rated only "fair" in the categories of "initiative," "attitude" and "cooperation," and satisfactory in all other categories.

Allen testified that he felt Erwin was not adequately versed in banking to be a successful training officer. Furthermore, Allen had noticed that Erwin had some conflicts with other managers. In mid-1978 Allen recommended to Whitehead that Erwin be placed on probation and discharged if he failed to improve, but Whitehead failed to take action on his request. Allen felt that Erwin was an ineffective training officer since he was unable to get the cooperation of management which he deemed necessary to assure that the bank's training programs were responsive to bank needs. Also dissatisfied with the manner in which Erwin interviewed prospective employees, Allen relieved Erwin of that duty.

## THE ALTOM PERIOD (JANUARY 1979 TO MAY 1979)

In December 1978 Altom, then age 48, was promoted to the position of director of Human Resources effective January 1, 1979. Pursuant to his assumption of new duties, one of which was supervising Erwin, Altom had a discussion with Whitehead about the training program in December 1978, when he told Whitehead that he was dissatisfied with the training program and that he planned to evaluate the program with the intent of seeking means of improvement. Furthermore, Altom told Whitehead that he would recommend a change in the training director in the absence of considerable improvement of the program.

On January 19, 1979, Altom and Erwin had a discussion concerning the training program. Altom told Erwin that he was dissatisfied with the training program and asked Erwin to reevaluate the program and make written recommendations for improvement within 10 or 12 days and that, in the absence of such improvements, he would recommend to Whitehead that Erwin be discharged. Altom also discussed the need of Erwin to improve his relations with senior officers, specifically, bank president Collins, senior vice president McKee, executive vice president Rial, and loan officer Davis. Erwin admitted his relations with these senior bank officers were strained, but he never tried to ascertain the reasons therefor; Erwin simply felt that the other officers did not adequately support him, i. e., he felt it was they, and not he, that were the source of the problems.

Although Erwin presented Altom with four or five folders of existing programs with penciled notations as to possible changes, he did not present the type of in-depth reanalysis of the program that Altom had desired and requested. Thereafter, in March, Altom recommended to Whitehead that Erwin be discharged. Whitehead told Altom that the decision was Altom's to make and that he, Whitehead, approved the recommendation of discharge. Consequently, Altom told Erwin he was discharged and would have 60 days within which to find another job. Although the 60 days were to have expired on May 18, Erwin remained at the bank until May 24, when he was finally relieved of all duties at the bank. Erwin was never placed on a period of formal probation, nor was he given the opportunity to transfer to another position in the bank system although it was bank policy to do either whenever possible. There was, in fact, no position available in the bank in which to transfer Erwin.[1] In the "exit interview" form, Altom stated that Erwin was terminated because his job performance levels were not up to acceptable standards and that he had problems dealing with people. Although Erwin was rated "average" in "quality of work" and "working speed," he was given a "below average" appraisal in the categories of "quantity of work," "initiative" and "job attitude" and "poor" in the areas of "cooperation," and "ability to get along with others."

Erwin was discharged for failure to update the training program and inability to secure the cooperation of management personnel necessary to the development of a successful training program. Although defense counsel attempted to insert innuendos that certain alleged personal misconduct by Erwin was the cause of Erwin's discharge, Altom affirmatively testified to the con-

trary. Accordingly, the court ordered all testimony relating to this incident to be stricken from the record.[2]

At the time of his discharge Erwin was 49 years of age, earning an annual salary of $19,120. He had received salary increases each year of his employment although the increases were very small, approximately four percent, in the last two years of his employment. Erwin was kept on at the bank until 1979 and received salary increases each year because the approval of Whitehead was necessary to fire employees. Whitehead was in favor of a formal training program and was careful to give Erwin every opportunity to prove himself despite repeated requests by senior officers that Erwin be relieved of his training duties. Since his termination he has been unable to secure other employment, although he made applications for various types of work. His duties were subsumed by Harold Altom initially and then Eugene Everett, age 42, who is the present director of Human Resources. The bank has no plans for hiring another person as training officer since it is felt that the position is not necessary.

### EVIDENCE OFFERED TO SHOW A PATTERN AND PRACTICE OF DISCRIMINATION BASED ON AGE

Plaintiff offered the testimony of four persons, other than Erwin, to prove his claim that the bank engaged in a pattern and practice of unlawful discrimination based on age.

In November 1977, Willie Lee Friday, then age 51, held the position of community bank president and manager at Ecru. Because of a loan policy conflict he had with another bank officer, he told Altom and others that he wished to step down from his position. According to Friday, the "stress

1. The Bank's policy was never to "surprise" an employee with sudden termination but to place one on probation contingent upon improvement in performance. Though this policy is not clearly applicable to officers, nevertheless Erwin was first counseled with by Altom before given 60 days termination notice. This departure from the stated policy is not signifi-

cant under the circumstances, nor causally related to Erwin's complaint.

2. Defense counsel's attempts to insinuate personal misconduct as a reason for discharge, in post-trial briefs to the court, blatantly ignore our evidentiary ruling and such arguments are not merely futile but highly objectionable to this court.

and strain" of the job had gotten to him. He took the position of administrative consultant, largely a public relations job, on terms which he, of his own volition, had incorporated into a written contract, including a cut in salary of approximately $5,000 per year. Friday was never told that he would be discharged if he refused to accept lesser responsibility. After reconsidering his decision, however, he requested he be reinstated as president, which Whitehead refused. Friday was replaced by a 30-year old individual. Friday currently works at the Ecru community bank from 20 to 25 hours a week.

Jim McAlexander, age 52, was manager of the Olive Branch bank branch until October 1979 when he was demoted to assistant manager and vice president. Bank officers suggested to McAlexander that he step down, although they did not say that he would be discharged if he refused to do so. This suggestion was made because of his admitted lack of knowledge of commercial lending. The 31-year old person who replaced McAlexander was more highly trained in aspects of commercial lending.

Harold Owings, age 53, had been a bank employee for 16 years until his discharge in 1979. Memoranda from bank officers in January indicate that Owings was discharged after several counselings about his personal behavior and work habits and attempts by the bank to place him in a position in which he could adequately perform.

Sarah Graddy, age 53, had been employed at the Ecru community bank for 22 years as a teller prior to her discharge in 1979. Since Graddy has an ADEA suit pending in this court, we are hesitant to discuss the merits of her discharge. We do note, however, that her discharge came after at least six discussions with Graddy and her supervisors, dating back to June 1977 concerning, inter alia, her bad customer attitude and failure to learn to operate certain machines. Graddy was replaced by a 23 year old individual.

Plaintiffs also point to the reference to "young college graduates" in the 1976 Annual Report and the management trainee program policy of giving preference to "college seniors or recent college graduates" as evidence of unlawful discrimination based on age.

Finally, as in virtually all discrimination cases, we are asked to look at statistical proof. Approximately 52% of the total population in the twelve-county area in which the bank has offices are over age 40. Only 20% of the bank's community bank presidents and the branch managers and officers at Tupelo are over 40, the average age of community bank presidents being 36 years. Since 1976, only one of the 16 persons hired as bank community president was over the age of 40, and this person, McAlexander, was subsequently demoted. Whitehead explained this discrepancy by noting that despite advertising and recruitment efforts other than through colleges, it was difficult to find experienced bank officers at salaries the bank could afford to pay, stating that it would cost at least 30% more to hire such a person if one could be induced to change his location. Since 1976, three of the 19 employees discharged were in the 40 to 70 statutorily protected age group. Of the 16 remaining discharged employees, six were probationary employees, having worked less than six months; three were discharged after being charged with embezzlement; and two were terminated after failing to report for work. In addition, only 16% of the tellers throughout the bank system hired since 1979 are within the protected age group; 21% of all tellers employed in the bank system during 1979 were within the protected age group.

## LEGAL ANALYSIS

We begin with the familiar proposition that "in private employment, one can be . . . discharged for almost any reason or for no reason" except a reason that is prohibited by statute or the Constitution of the United States. *Davis v. Williams,* 617 F.2d 1100, 1103 (5 Cir. 1980) (en banc). In this case, neither are we concerned with whether there was just cause to fire the plaintiff. The plaintiff's action is based on the allegation that his discharge was based on age

and is thus violative of the Age Discrimination and Employment Act, 29 U.S.C. § 621 et seq.

■ The ultimate inquiry, of course, is "whether plaintiff has established sufficient grounds to prove age was a determinative factor" in the employer's decision to discharge him. *Carter v. Maloney Trucking & Storage, Inc.*, 631 F.2d 40, 42 (5 Cir. 1980). A prima facie case of age discrimination may be made by showing (1) the plaintiff was within the protected group (i. e. between the ages of 40 and 70), (2) he was discharged, (3) he was qualified for the position from which he was discharged, and (4) he was replaced by a person outside the protected group. *Price v. Maryland Casualty Co.*, 561 F.2d 609, 612 (5 Cir. 1977). We conclude that, although plaintiff clearly met the first two elements of prima facie showing, he failed to meet the latter two requirements.

■ As to the qualification factor, Erwin himself admitted that cooperation of management personnel was essential to the successful performance of his job and that he was unable to secure this vital cooperation. "Attitude" and the "ability to get along with supervisors" have been recognized as important and valid qualifications under certain circumstances. *See Lindsey v. Southwestern Bell Tel. Co.*, 546 F.2d 1123, 1124 (5 Cir. 1977). Factors such as "initiative" and "flexibility" have also been held to be proper criteria for job performance. *See Price, supra*, at 612. Although consideration of such seemingly subjective qualifications has been criticized in some employment discrimination cases, they become, in our mind, more justifiable when the employee is in a management-type position as was Erwin. For example, while one could argue that "attitude" and "initiative" are of nominal importance in an assembly line job, the same could hardly be said to be true when the employee holds an important official position in a banking corporation and his duties require his ability to work with top management in training decisions and programs. We therefore conclude that Erwin lacked the qualifications required for his job as the bank's Training Director.

We also hold that Erwin failed to meet the fourth prerequisite of a prima facie case. Here, as in *Price, supra*, Erwin's position was never filled; rather, the bank decided to delete the position altogether. Altom and later Everett took over the duties of training officer, and both of these individuals were within the protected age group. The Fifth Circuit has held that a discharged employee need not always show that he was replaced by someone in the nonprotected age group. *See McCuen v. Home Ins. Co.*, 633 F.2d 1150 (5 Cir. 1981); *McCorstin v. United States Steel Corp.*, 621 F.2d 749, 753–54 (5 Cir. 1980). Both the *McCuen* and *McCorstin* cases, however, involved situations where the employee was discharged because of a reduction in force and are, therefore, inapplicable to the case *sub judice*. Plaintiff's counsel nevertheless advances two ingenious arguments: first, that Altom and Everett, both being younger than Erwin although in the protected group, satisfy this element of a prima facie case, and secondly, that if such an element is necessary, all an employer guilty of age discrimination in firing employees need do is not replace the discharged person. Both contentions are manifestly unsound. The Supreme Court as well as the Fifth Circuit have laid down what is necessary to constitute a prima facie case, and we are not at liberty to ignore any portion of that formula. Of course, the inability to meet the four criteria for a prima facie case does not foreclose plaintiff from adducing evidence of discrimination on account of age sufficiently convincing to prevail on his claim. This, however, Erwin failed to do.

■ Assuming, arguendo, that Erwin established a prima facie case of age discrimination, we are firmly convinced that the bank effectively rebutted this showing. As the Fifth Circuit has stated:

Upon a prima facie showing by the plaintiff, there is a shift, but not in the burden of proof. Only the burden of going forward with the evidence shifts to the defendant-employer. Once the defendant-employer comes forward with evidence

that the plaintiff was discharged because of reasonable factors other than age, the plaintiff must still bear the burden of establishing a case of discrimination by a preponderance of the evidence.

*Bittar v. Air Canada,* 512 F.2d 582, 582–83 (5 Cir. 1975) (citations omitted), *quoted in Carter, supra.* The overwhelming weight of the evidence is that Erwin was discharged for his inability to obtain cooperation from other officers, his failure to make requested improvements in the training program, and to a lesser extent, his lack of technical banking knowledge. These are certainly "reasonable factors" upon which an employer may base a decision to discharge an employee, particularly where, as here, that employee holds a sensitive and important official position within a large banking establishment.

Furthermore, plaintiff failed to show that the articulated reasons were a mere pretext of discrimination. The fact that a few other protected employees received adverse treatment from the bank during the same time period has little relevance under the facts *sub judice.* We note that in age discrimination cases, statistics are generally accorded less weight than in other types of employment discrimination cases. *See Kephart v. Institute of Gas Technology,* 630 F.2d 1217 (7 Cir. 1980); *Mastie v. Great Lakes Steel Corp.,* 424 F.Supp. 1299, 1320 (E.D.Mich.1976). The statistics on bank tellers have, in our mind, extremely limited probative value, if any at all. As to the 19 employees discharged, of which only three were within the protected age group, the small numbers involved greatly weaken the force of the statistical relevance of the disparities. *See Thompson v. Leland Police Dept.,* No. GC77–61–K–O (N.D.Miss. Dec. 13, 1979), *aff'd mem.* 633 F.2d 581 (5 Cir. 1980); *Williams v. Tallahassee Motors, Inc.,* 607 F.2d 689, 693 (5 Cir. 1979).

In short, after having an opportunity to observe the witnesses, and their demeanor on the stand, together with a study of the documentary evidence, we are of the firm conviction that age played no factor in the bank's decision to terminate Erwin. Rath-

er, it appears to us that, although eminently qualified to teach at a college or university level, Erwin was not equipped to deal effectively with the practical aspects of the banking world.

Let judgment be issued accordingly.