RETSIEG CORP., Plaintiff–Appellant,

v.

ARCO PETROLEUM PRODUCTS COMPANY, and Does I through X, inclusive, Defendants–Appellees.

No. 87–2907.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 1989.

Decided March 28, 1989.

Robert J. Kahn, San Ramon, Cal., for plaintiff-appellant.

Jeffrey M. Hamerling, Tuttle & Taylor, Inc., Los Angeles, Cal., for defendants-appellees.

Before BROWNING, BEEZER and KOZINSKI, Circuit Judges.

BEEZER, Circuit Judge:

Retsieg Corporation appeals the district court's order of summary judgment in favor of Atlantic Richfield Company ("ARCO"), in Retsieg's action under 15 U.S.C. §§ 2801–41 (1982) challenging ARCO's termination of Retsieg's gasoline

franchise for selling non-ARCO gasoline in violation of the franchise agreement. We reverse and remand.

### I

In reviewing an order of summary judgment we view the facts in the light most favorable to the nonmoving party, Retsieg. *See United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1543 (9th Cir.1989) (en banc). In June 1985, Retsieg entered into franchise agreements with ARCO under which Retsieg operated an ARCO am/pm Mini Market in Monterey, California. Retsieg was authorized to use ARCO trademarks in connection with the sale of "ARCO branded motor fuels." ARCO, in its response to interrogatories, defined "ARCO branded gas" as "[g]asoline which contains the ARCO additive R–585." This was not, it seems, a complete answer; ARCO apparently requires specification ranges, for various types of gasoline, between .05 and .12 percent of R–585 by volume, but the record on this material question of fact is not conclusive.

In October 1986, Retsieg began looking for a cheaper supplier of gasoline than ARCO itself. The parties differ as to whether Retsieg specifically sought another source of ARCO gasoline. In the absence of conclusive evidence to the contrary, we assume that it did. On October 14, 1986, Bob Paulk, the president of Retsieg, informed an ARCO representative that Retsieg would begin purchasing ARCO gasoline from another distributor, Caljet, because the price was lower. In October and November of 1986, Retsieg purchased some 100,000 gallons from Caljet, including substantial amounts of all types of gasoline sold by Retsieg under the ARCO label.

On October 18, 1986, an ARCO representative purchased one gallon each of regular, unleaded, and super unleaded gasoline sold by Retsieg under the ARCO label. Each sample was tested for R–585. The regular sample was at the high end of the specifications for R–585. The super unleaded and unleaded samples contained, respectively, .02 and .03 percent R–585. The minimum specified percentage for each was .08.[1] ARCO communicated directly with Caljet about the situation. Caljet's representative, Lynn Tierney, advised Retsieg on November 7, 1986, that Caljet could not sell gasoline to Retsieg as long as Retsieg sold it as ARCO gas. Also on November 7, ARCO terminated Retsieg's franchise by written notice because of alleged misbranding by Retsieg.

Retsieg sued in the district court claiming that ARCO's termination violated the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–41 (1982). On September 22, 1987, the district court granted ARCO's motion for summary judgment on the grounds that no genuine issue of material fact remained concerning Retsieg's sale of misbranded gasoline. Retsieg timely appeals. Fed.R.App.P. 4(a)(1). We have jurisdiction over this final judgment. 15 U.S.C. § 2805(a); 28 U.S.C. § 1291. We review an order of summary judgment de novo, to ascertain whether any genuine issue of material fact remains to be tried. *United Steelworkers*, 865 F.2d at 1540.

### II

ARCO's defense of its termination under the PMPA depends upon 15 U.S.C. § 2802. This section defines "willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee" as an event reasonably allowing the franchisor to terminate. 15 U.S.C. § 2802(b)(2)(C); (c)(10). The meaning of "willful" in this section of the PMPA is a question of first impression in this or any other circuit.

The district court analyzed the case as follows: 1) It was "undisputed that [Retsieg] purchased 100,000 gallons of gas from Caljet, none of which was ARCO branded"; and 2) *Gilderhus v. Amoco Oil Co.*, 1980–81 Trade Cas. (CCH) ¶ 63,648, 77,495, 1980 WL 1956 (D.Minn. July 30, 1980),[2] defined "willful" as used in 15 U.S.

---

1. ARCO's internal memorandum regarding the testing concluded that the unleaded and super unleaded samples "appear to be other than ARCO product[;] resampling is advised."

2. Not to be confused with an earlier ruling reported in the Federal Supplement. *Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302 (D.Minn. 1979).

C. § 2802(c)(10) as "a conscious, intentional, deliberate and voluntary act. Proof of willfulness under this provision does not require proof of bad motive, nor does evidence of good faith negate the willfulness of an act covered by said provision."

Following the teaching of *Gilderhus*, the district court therefore held, without further analysis, that there was no triable issue of fact "as to the definition of ARCO gas and as to [Retsieg's] sale of non-ARCO branded gas."

■ The district court's stated reasons for the grant of summary judgment were insufficient. First, it was not "undisputed" that Caljet sold *no* ARCO gasoline. ARCO's own tests on the tank of regular gas call that fact into serious question. And if Retsieg *received* some ARCO gasoline, we cannot hold as a matter of summary judgment that Retsieg did not *request* ARCO gasoline from Caljet, despite the absence of any such indication on purchase orders or invoices. It may be coincidence that some of Caljet's gasoline was ARCO gasoline, but that is for the trier of fact to determine.

Second, the definition of ARCO gasoline is not so clear as to allow us to find that ARCO established misbranding (whether willful or not) to the satisfaction of any rational jury. The only test results in the record show that three samples of Retsieg's "ARCO" gasoline contained significant amounts of R–585, although two contained less than ARCO's specification ranges, as stated in ARCO's memorandum. ARCO's interrogatory response, however, can reasonably be read as conceding that *any* amount of R–585 qualifies gasoline as ARCO product. Further factfinding appears necessary.

Third, Retsieg's argument that the district court applied a strict liability standard is not without merit. A reasonable reading of the opinion certainly leads to the conclusion that the court reasoned as follows: 1) motive is not a factor; 2) a voluntary act is enough; 3) Retsieg purchased the wrong gasoline; 4) thus, Retsieg violated the PMPA. This indeed appears to be a strict liability ruling that any purchase of the wrong gasoline, followed by its sale under the ARCO label, was per se a "willful misbranding." This analysis gives the word "willful" little, if any, real meaning beyond "an act." The district court's rationale for granting summary judgment fails, because the proper definition of "willful" is more complex than the court's analysis indicates.

We must define "willful misbranding" and apply that definition to the facts before the district court. PMPA precedent from our circuit and other circuits is not particularly helpful. In *Wisser Co. v. Mobil Oil Corp.*, the Second Circuit found that the sale of non-Mobil gasoline by a franchisee was grounds for termination. 730 F.2d 54, 56–57 (2d Cir.1984). The issue of willfulness did not directly arise, however, because the franchisee admitted to selling non-Mobil gasoline, which apparently was defined as gasoline not sold by Mobil. The Seventh Circuit also proceeded from the basic assumption that "Mobil gasoline" is only that gasoline actually sold by Mobil directly to the franchisee. *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 708, 710–11 (7th Cir.1985). Most recently, we also took it as a given that fuel purchased from a dealer other than Chevron was not Chevron fuel. *Chevron U.S.A., Inc. v. Finn*, 851 F.2d 1227, 1230 (9th Cir.1988) (per curiam), *cert. denied*, —— U.S. ——, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989). In these cases, the actual status of the gasoline as "misbranded" was not materially in dispute. The distinction here, of course, is that ARCO admits that "ARCO-branded gasoline" may in fact be sold by dealers other than ARCO itself.

Several district courts have more directly considered "willfulness." *L.C. Williams Oil Co. v. Exxon Corp.*, 627 F.Supp. 864, 870 (M.D.N.C.1985) (franchisee's "good faith" irrelevant when he "has admitted to consciously and deliberately selling non-Exxon gas...."); *H.R.H. Service Station, Inc. v. Exxon Co., U.S.A.*, 591 F.Supp. 25, 26 (S.D.N.Y.1983) (franchisee allowed by contract to sell gasoline not purchased from Exxon if pumps were "deidentified"; in light of routine purchases of non-Exxon gasoline, and franchisee's knowledge of deidentification requirement, franchisee's

argument that single sale relied upon by franchisor was "inadvertent" failed to create material issue as to willfulness); *Haynes v. Exxon Co., U.S.A.*, 512 F.Supp. 543, 544 (E.D.Tenn.1981) (no issue of material fact as to willfulness when sale of non-Exxon fuel under Exxon brand name was "undisputed"). These cases all relied on *Gilderhus*, 1980–81 Trade Cas. at ¶ 63,648. Chief Judge Devitt's thoughtful opinion in *Gilderhus* rejected a suggested definition of willful, based upon criminal law, as "specific intent or bad motive". *Id.* Rather, in light of the intent of Congress in this civil statute to establish a rule of "reasonableness" for franchise terminations, the relevant standard was held to be that of a conscious and deliberate act, without any burden of proof as to motive. *Id.*

None of these district court cases, then, addressed the instant situation. Rather than attempting to justify an admittedly voluntary misbranding by showing good faith (such as lack of knowledge that acts of misbranding violated the franchise agreement, *Haynes*, 512 F.Supp. at 544), Retsieg claims that it did not intend to misbrand at all.

*Gilderhus* cited with approval our definition of "willful" in the context of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–78. *Gilderhus*, 1980–81 Trade Cas. at 77,494–95 (citing *National Steel & Shipbuilding Co. v. Occupational Safety and Health Review Comm'n*, 607 F.2d 311 (9th Cir.1979)). *National Steel* defined " 'a willful violation as one involving voluntary action, done either with an intentional disregard of, or plain indifference to, the requirements of the statute.' " 607 F.2d at 314 (quoting *Georgia Elec. Co. v. Marshall*, 595 F.2d 309, 319 (5th Cir. 1979)).

■ We adopt *National Steel's* well-reasoned definition for PMPA purposes: A willful adulteration, mislabeling, or misbranding is one involving voluntary action, done either with an intentional disregard of, or plain indifference to, the requirements of the franchise agreement. This

definition requires, then, either an intent to misbrand—"willful," after all, modifies "misbranding"—or plain indifference to the agreement. It therefore would not have been willful misbranding for Retsieg to sell fuel purchased from a supplier who had promised ARCO gasoline, unless Retsieg, by engaging in the transaction, was plainly "indifferent" to the franchisor's requirements. In other words, applying a standard of reasonableness, was the purchase of "ARCO gasoline" from Caljet so unreasonable as to have amounted to plain indifference?

The evidence is not conclusive. Retsieg claims it requested ARCO gasoline from Caljet. There is no documentary evidence of this apart from Paulk's letter to ARCO, but we construe the evidence in Retsieg's favor. Given ARCO's definition of its product, we cannot conclude that Retsieg was plainly indifferent to the branding requirement by attempting to purchase ARCO gasoline from another dealer.

■ Caljet denies ever having supplied ARCO gasoline to Retsieg. This denial is contradicted by the presence of pure ARCO gasoline in the regular tank. The other two tanks were not up to full ARCO specifications, but they met ARCO's interrogatory definition of its gas. The two tanks contained, apparently, ARCO gasoline significantly adulterated by non-ARCO gasoline. Under these facts, we cannot affirm summary judgment based upon events occurring prior to the termination of the franchise on November 7, 1986, because ARCO has not conclusively shown the adulteration to be willful.[3] A reasonable jury could find Retsieg's actions not to have constituted willful misbranding. *See United Steelworkers*, 865 F.2d at 1541–43. The fact that adulterated gasoline was sold is not per se sufficient, absent proof of an intent to sell misbranded or adulterated gasoline, or acts constituting plain indifference to the branding requirement. In light of our definition of "willful misbranding" under the PMPA, material questions of fact re-

---

**3.** We do not consider whether acts of misbranding occurred after termination, because, under the PMPA, termination for misbranding must be based upon actual or constructive knowledge of an offense taking place not more than 120 days prior to notification of termination. 15 U.S.C. § 2802(b)(2)(C).

main concerning the definition of ARCO gasoline, the specifications of the gasoline Caljet sold to Retsieg, and Retsieg's intent in purchasing Caljet gasoline.

REVERSED and REMANDED.