272 F.3d 138 (2nd Cir. 2001)
 KOYLUM, INC., PLAINTIFF-APPELLEE,
v.
PEKSEN REALTY CORP., F/K/A ROUTE 25 CALVERTON REALTY CORP., SUCCESSOR BY MERGER TO RIDGE PETROLEUM REALTY CORP., DEFENDANT-APPELLANT,
1677 RIDGE ROAD REALTY CORP., A NECESSARY PARTY, APPELLANT.
 Docket Nos. 99-9039 (L), 99-9229 (CON)
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: January 17, 2001
Decided: November 21, 2001
 
 Defendant-lessors of a gas station appeal from grant of preliminary injunction under the Petroleum Marketing Practices Act by the United States District Court for the Eastern District of New York (Spatt, J.) enjoining them from pursuing proceedings to oust the plaintiff-tenant. The Court of Appeals (Leval, J.) affirms.
 Robert G. Del Gadio, Law Office of Robert G. Del Gadio, Uniondale, Ny, for Defendant-Appellant 1677 Ridge Road Realty Corp.
 Edward A. Christensen, Law Office of Edward A. Christensen, Oyster Bay, Ny, for Appellant Peksen Realty Corp.
 Arnold P. Azarow, Law Office of Arnold P. Azarow, Garden City, Ny, for Plaintiff-Appellee Koylum, Inc.
 Before: Van Graafeiland, Newman, and Leval, Circuit Judges.
 
 Leval, Circuit Judge
 
 1
 Defendants, who are lessors of a gas station, appeal from an order of the United States District Court for the Eastern District of New York (Spatt, J.) preliminarily enjoining them from ousting their tenant, plaintiff Koylum, Inc., the operator of the station. The defendants contend that under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 et seq., the district court did not have subject matter jurisdiction over Koylum's suit, and, in the alternative, that the district court abused its discretion in granting a preliminary injunction.
 
 
 2
 Because we conclude that the PMPA provides jurisdiction over Koylum's suit and that the district court did not abuse its discretion in granting a preliminary injunction under the PMPA's lenient standard, we affirm.
 
 BACKGROUND
 I. Factual Background
 
 3
 Koylum has operated a gas station in Ridge, New York, since May 1996. The station was previously operated by Koylum's assignor, RBP Enterprises, under two agreements: the Lease Agreement, dated January 1, 1994, under which Koylum's assignor leased the premises from the predecessor in interest of defendant Peksen Realty Corp. (Peksen); and the Supply Agreement, also dated January 1, 1994, fixing the terms under which Koylum's assignor would purchase its gasoline supplies from Ocean Petroleum, Inc. (Ocean). Both agreements expire on December 31, 2011. The Supply Agreement permitted Ocean to designate a substitute supplier. It also authorized Koylum's assignor to use the brand names and trademarks designated by Ocean in connection with the sale of fuel. Peksen and Ocean are affiliated with one another; both are closely held corporations owned by Refik and Mine Peksen (who are husband and wife).
 
 
 4
 A. The December 1995 Rider to the Supply Agreement
 
 
 5
 On December 1, 1995, Ocean and Koylum's assignor agreed to an alteration of the Supply Agreement (the Rider). The Rider required Ocean to quote the next day's prices for gasoline and permitted Koylum's assignor to purchase gasoline from "any other open market supplier" of gasoline if Ocean's quoted prices were above the prices specified by a formula. The Rider required (i) that Koylum's assignor document its calculations justifying its exercise of the option to purchase from another supplier, and (ii) that the transport of fuel by "any supplier from all terminals in the Long Island and Metropolitan area" to the station be made by National Petroleum Transporters at a specified rate.
 
 
 6
 In May 1996, by assignment Koylum became the lessee under the Lease Agreement. In August 1996, in order to take advantage of the favorable price restriction formula and option to purchase gasoline from another supplier contained in the Rider, Koylum, with Ocean's consent, obtained the assignment of the Supply Agreement.
 
 
 7
 Ocean, which has since been liquidated in bankruptcy, was an authorized distributor for Coastal Refinement Corporation (Coastal) and sold Coastal brand products to Koylum for resale at the station. It is undisputed that Ocean was authorized by Coastal to use the Coastal mark, that Ocean permitted Koylum to use the Coastal mark in connection with its operation of the station, and that the station was operated as a Coastal gas station. No express mention was made of the Coastal mark in any of the written agreements between Koylum and Ocean or Peksen.
 
 B. The October 1998 Notice of Termination
 
 8
 The relationship between Koylum and Ocean/Peksen deteriorated. Koylum asserts that Ocean frequently failed to supply it with a price list for petroleum products as required by the Rider; Koylum turned to other suppliers for fuel, including non-Coastal brand suppliers. In August 1997, Koylum sent a letter "to remind" Ocean that it was required under the Rider to send the next day's gasoline prices. Ocean responded by letter in September 1997 advising Koylum that the Rider required documentation supporting a claim for excessive pricing that would permit Koylum to purchase gasoline from other suppliers. Ocean also reminded Koylum that all products delivered to the station were to be transported by National Petroleum Transporters at the rate indicated in the Rider. Ocean's letter warned Koylum that "you have failed to adhere to these requirements and continuance of these actions will cause a default of your supply agreement as well as your Lease agreement."
 
 
 9
 In July 1998, Ocean apparently encountered difficulty in obtaining supplies of gasoline from the Coastal refinery and instead supplied Koylum with fuel from other sources, including non-Coastal brand suppliers. Koylum asserts that it purchased non-Coastal gasoline in September 1998 because Ocean failed to send price lists on a daily basis or because the prices quoted by Ocean were higher than the price restriction formula contained in the Rider. Koylum's purchases resulted in Ocean/Peksen's attempt to terminate the agreements between the parties.
 
 
 10
 By letter dated October 2, 1998, Peksen informed Koylum that it would terminate the Lease Agreement as of midnight October 6, 1998. By a substantially similar letter also dated October 2, 1998, Ocean notified Koylum that it would terminate the Supply Agreement at the same time. The letters asserted that Koylum violated the Supply Agreement and the Lease Agreement by, among other things,
 
 
 11
 - purchasing unbranded gasoline from unauthorized suppliers and selling it under the Coastal trademark and brand name;
 
 
 12
 - causing gasoline from an unauthorized source to be mixed in the station's underground tanks with gasoline supplied by Ocean; and
 
 
 13
 - using and occupying the station for the sale of gasoline not approved by Ocean and Peksen.
 
 
 14
 The notices also asserted that Koylum's purchases of unbranded gasoline for sale under the Coastal brand name constituted trademark infringement, unfair competition under the Lanham Act, and false advertising and trademark dilution under New York law.
 
 
 15
 On October 7, 1998, Peksen filed a petition in Suffolk County District Court to oust Koylum from the premises as a holdover tenant--one that remains on the premises after the expiration of the lease without any vested right to remain. See Bay West Realty Co. v Christy, 310 N.Y.S.2d 348, 351 (Civ. Ct. 1970); 90 N.Y. Jur. 2d Real Property-Possessory and Related Actions § 398, at 298 (1991). Koylum counterclaimed for a declaratory judgment allowing it to continue to occupy the premises. Koylum secured a stay of the holdover action, which remained in place by stipulation of the parties.
 
 C. Ocean's Bankruptcy
 
 16
 On October 29, 1998, Coastal canceled Ocean's right to use its trademarks and terminated its agreement to sell petroleum products to Ocean, effective February 3,1999. Ocean did not advise Koylum of the cancellation. On November 20, 1998, Ocean filed a Chapter 11 bankruptcy petition.
 
 
 17
 In January 1999, Ocean elected before the bankruptcy court to reject its executory Supply Agreement with Koylum. On February 25, 1999, Koylum filed a claim against Ocean in bankruptcy court for rejection damages based on the rejection of the Supply Agreement.
 
 
 18
 At some time in January 1999, Koylum removed all Coastal logos and marks at its station. Koylum asserts that it did this on the advice of counsel in order to avoid further charges that it was violating Coastal's trademark.
 
 
 19
 Ocean voluntarily converted its bankruptcy case to a chapter 7 liquidation proceeding and ceased operating on June 18, 1999.
 
 
 20
 D. The January 1999 Notice of Termination and the Sale of the Premises to 1677 Ridge Realty Corp.
 
 
 21
 By letter dated January 29, 1999, Peksen again notified Koylum that its lease was terminated on the ground that Koylum sold non-Coastal gasoline purchased from another supplier. Peksen then filed a new holdover petition, which was dismissed in March 1999 because of the stay entered in October 1998.
 
 
 22
 On May 6, 1999, without giving Koylum prior notice, Peksen sold the station to 1677 Ridge Realty Corp. (1677 Ridge). 1677 Ridge promptly filed another petition to oust Koylum as a holdover tenant, followed by a claim for unpaid rent reasserting the grounds advanced by Peksen in its two previous holdover petitions against Koylum. 1677 Ridge's holdover petition was dismissed in July 1999, apparently on the theory that the subsequent nonpayment petition served to reinstate the lease.
 
 
 23
 II. Koylum's Initiation of This Action and Its Motion for Preliminary Injunction
 
 
 24
 In July 1999, Koylum filed this suit pursuant to the PMPA, which generally forbids a franchisor from terminating a franchise prior to its expiration date without justification. See 15 U.S.C. §§ 2802, 2805.[1] Koylum contended that Peksen had no cause to terminate the franchise, because the portions of the franchise agreement that Peksen claimed Koylum had violated (concerning the purchase of gasoline from suppliers other than Ocean) had been superceded by the Rider. Therefore, Koylum maintained, there were no proper grounds for termination, and Peksen's actions were unlawful. The complaint sought declaratory relief to that effect. It also asserted that the sale of the premises to 1677 Ridge violated provisions of the PMPA requiring Peksen to give Koylum notice of the sale and a right of first refusal to purchase the premises. See 15 U.S.C. § 2802(b)(3)(D)(iii) (requiring under certain circumstances that franchisor make a bona fide offer to sell the leased premises to franchisee or to grant franchisee a right of first refusal). Koylum sought as ultimate relief to compel Peksen to rescind the sale of the gas station to 1677 Ridge and to grant Koylum the right of first refusal to purchase the leased premises. Simultaneously, Koylum moved for a preliminary injunction enjoining 1677 Ridge or Peksen from pursuing holdover or non-payment proceedings in state court. See id. § 2805(b)(2).
 
 
 25
 A. The Magistrate Judge's Report and Recommendation
 
 
 26
 Magistrate Judge Pohorelsky, to whom the district court referred the motion, recommended that the district court enter a preliminary injunction to bar the defendants from continuing proceedings in state court to oust Koylum until the federal proceeding was finally determined. The magistrate judge recommended that Koylum be permitted to continue in possession of the premises subject to the provisions of the January 1, 1994, Lease Agreement.
 
 
 27
 The magistrate judge found that, on the facts presented, the relationship among Koylum, Peksen, and Ocean constituted a franchise relationship, bringing it within the scope of the federal jurisdiction established by the PMPA. He rejected 1677 Ridge's argument that the PMPA did not apply because the marks of a specific refiner were not identified in either agreement. The PMPA specifically permits contracts to be oral,[2] and it was undisputed that Ocean orally authorized Koylum to use Coastal's marks in connection with the sale of gasoline products. While recognizing that this was not dispositive, the magistrate judge noted that the parties expressly agreed in the Supply Agreement that their agreement constitutes a franchise relationship pursuant to the PMPA.
 
 
 28
 The magistrate judge recommended that the court exercise its discretion to grant preliminary injunctive relief. Recognizing that the standard for injunctive relief under the PMPA is "lenient," he analyzed the three-prong test for injunctive relief under the statute. See 15 U.S.C. § 2805(b)(2).
 
 
 29
 As to the first prong of the test--a showing that the franchise has been terminated, see id. § 2805(b)(2)(A)(i)--there was no dispute that Peksen was seeking to terminate the relationship with Koylum. As to the second prong--whether there were sufficiently serious questions going to the merits to make such questions a fair ground for litigation--the magistrate judge concluded there were serious questions as to the propriety of the termination presenting a fair ground for litigation. See id. § 2805(B)(2)(A)(ii). He rejected Peksen's argument that Koylum's undisputed purchase and sale of unbranded gasoline was, without more, a proper basis for termination, because he found the Rider ambiguous as to whether Koylum was permitted in the circumstances to do so. In light of the ambiguities of the Rider, and Ocean's delivery of unbranded gasoline to Koylum for sale under the Coastal mark, the magistrate judge found that it was not unreasonable for Koylum to believe that it was authorized to purchase and sell unbranded gasoline. Peksen argued before the magistrate judge that Koylum's failure to provide documentary justification for its purchases from other suppliers, and its failure to use National Petroleum Transporters to deliver gasoline independently justified termination. The Magistrate Judge nonetheless found serious questions as to the propriety of the termination, first because these purported grounds were arguably not breaches supporting termination and, in any event, Peksen had not given notice of these grounds in any of the termination notices as required by the PMPA.
 
 
 30
 As to the third prong--the balance of hardships, see id. § 2805(b)(2)(B)--the Magistrate Judge found the hardship imposed on Peksen and 1677 Ridge by maintenance of the status quo to be less than the hardship that would fall on Koylum if evicted. With respect to 1677 Ridge, the magistrate judge found no significant hardship imposed on it resulting from continuation of Koylum's possession and use of the station until adjudication of the dispute, because (i) 1677 Ridge was still entitled to receive rent from Koylum under the existing lease and had offered no evidence to substantiate its ability to use the property more profitably, and (ii) 1677 Ridge purchased the property with full knowledge of the dispute between Koylum and Peksen, and Koylum's eviction from its tenancy would, of course, end its ability to do business.
 
 
 31
 B. The District Court's Grant of a Preliminary Injunction
 
 
 32
 1677 Ridge and Peksen filed objections to the Report and Recommendation, all of which were overruled by the district court.
 
 
 33
 The district court adopted the magistrate judge's Report and Recommendation in its entirety and entered a preliminary injunction against Peksen and 1677 Ridge.
 
 
 34
 This appeal followed.
 
 DISCUSSION
 
 35
 Peksen and 1677 Ridge contend that there is no federal subject matter jurisdiction under the PMPA because: (1) no franchise within the meaning of the PMPA has ever existed; and (2) no franchise existed at the time of Koylum's suit due to Ocean's bankruptcy and rejection of the Supply Agreement.
 
 
 36
 Peksen and 1677 Ridge also contend that, even if the PMPA does apply, the district court abused its discretion in granting the preliminary injunction. They advance three reasons: (1) the lenient standard for preliminary injunction under the PMPA does not apply because Koylum is not seeking to compel continuation or renewal of a franchise relationship; (2) Peksen and 1677 Ridge have been prejudiced by Koylum's failure to seek injunctive relief upon receipt of the October 2, 1998, or the January 29, 1999, termination notices and because Koylum acquiesced to the end of the franchise relationship by removing or covering over Coastal signs on its premises; and (3) Koylum's conduct in selling non-Coastal gasoline amounted to a fraud on the public, so that there was not a serious question of the reasonableness of the termination.
 
 
 37
 We conclude that there is federal subject matter jurisdiction over Koylum's suit, and that the district court did not abuse its discretion in granting a preliminary injunction.
 
 
 38
 I. Subject Matter Jurisdiction Under the PMPA.
 
 
 39
 A. Was There a PMPA Franchise?
 
 
 40
 Relying on Merlino v. Getty Petroleum Corp., 916 F.2d 52 (2d Cir. 1990), the defendants contend these facts do not involve a "franchise" within the meaning of the PMPA. Consequently, they argue, the court lacked subject matter jurisdiction. In Merlino, we affirmed the dismissal of a complaint for lack of subject matter jurisdiction where the defendant distributor[3] owned and controlled the trademark used in connection with the sale of fuel at the gas station operated by the plaintiff, a retailer. We concluded that the Act does not reach the trademark arrangements of "non-integrated entities such as non-refiner-distributors who control their own trademarks." Id. at 53-54. Because Ocean was a distributor, not a refiner, and because the Supply Agreement gave Ocean the right to designate any brand names and trademarks (or none at all) for fuel sold at the station, the defendants argue that subject matter jurisdiction under the PMPA is similarly lacking.
 
 
 41
 We disagree. The relationship created by the Supply Agreement falls under the statute's definition of a franchise. The statute provides several definitions of "franchise," including any contract
 
 
 42
 between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.
 
 
 43
 15 U.S.C. § 2801(1)(A)(iv). We recognized in Merlino that this provision included the case where a defendant distributor supplied petroleum products for resale under a trademark owned or controlled by a refiner. We stated: "The term ["franchise"] includes not only contracts where one of the parties is a refiner, but also contracts solely between distributors and retailers, if the distributor authorizes the retailer to sell motor fuel under `a trademark which is owned or controlled by... a refiner which supplies motor fuel to the distributor....'" Merlino, 916 F.2d at 53 (quoting 15 U.S.C. § 2801(1)(A)). The alternative situation contemplated in Merlino is identical to the circumstances of this case. Coastal is a refiner; Ocean, a distributor, orally authorized Koylum, a retailer, to use Coastal's marks.[4] The relationship is a franchise under the Act. Filling in the blanks of the statute, we have a contract "between a distributor [Ocean] and a retailer [Koylum], under which a... distributor [Ocean]... permits a retailer [Koylum]... to use, in connection with the sale... of motor fuel, a trademark [Coastal] which is owned... by... a refiner [Coastal] which supplies motor fuel to the distributor [Ocean] which authorizes or permits such use [by Koylum]."
 
 
 44
 It is true that under the Supply Agreement, Ocean had the power to designate its own marks rather than a mark owned by a refiner, and that, had it done so, the relationship might not have been a "franchise" under the teaching of Merlino. Whether the parties were in a franchise relationship, however, turns on the relationship that existed, not on the fact the parties might have constructed a different relationship.
 
 
 45
 A "franchise" relationship also arose under the PMPA from the Lease Agreement. An alternate definition of franchise provided by § 2801(1)(B)(i) includes
 
 
 46
 any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such a refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy.
 
 
 47
 Under the statute's definitions, the "term `distributor' means any person, including any affiliate of such person, who purchases motor fuel for sale, consignment, or distribution to another." 15 U.S.C. § 2801(6)(A). "Affiliate" is defined as "any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person." Id. § 2801(15).
 
 
 48
 Peksen was under common control with Ocean and was thus an affiliate of Ocean. Peksen thus came within the definition of "distributor," because its affiliate Ocean "purchased motor fuel for resale... to another."
 
 
 49
 The Lease Agreement between Peksen and Koylum, therefore, qualified as a "franchise." Following the definition of § 2801(1)(B)(i), the Lease Agreement was a "contract under which a retailer [Koylum]... is authorized... to occupy leased marketing premises [the gas station], which premises are to be employed in connection with the sale... of motor fuel under a trademark [Coastal] which is owned... by a refiner [Coastal] which supplies motor fuel to the distributor [Peksen--as affiliate of Ocean] which authorizes or permits such occupancy [by Koylum]."
 
 
 50
 Accordingly, under either the definition of § 2801(1)(A)(iv) or § 2801(1)(B)(i), the statute's definition of franchise is satisfied.
 
 
 51
 B. Does Ocean's Bankruptcy Defeat Federal Subject Matter Jurisdiction?
 
 
 52
 Appellants next argue that, even if there was at one time a franchise relationship, no such relationship--and therefore no subject matter jurisdiction--existed at the time of the suit because of Ocean's bankruptcy and rejection of the executory Supply Agreement in January 1999. Appellants argue that, as of Ocean's rejection in the bankruptcy court of the executory Supply Agreement, Ocean ceased to "authorize[] or permit a retailer [Koylum]... to use... [Coastal's] trademark." Id. § 2801(1)(A)(iv). They contend that, therefore, as of the rejection, the § 2801(1)(A)(iv) definition of "franchise" ceased to describe their relationship with Koylum, with the consequence that Koylum's subsequent suit was not within the subject matter jurisdiction established by the PMPA.
 
 
 53
 It makes no difference, however, whether a franchise relationship existed when Ocean rejected the Supply Agreement. What matters is whether the complaint alleges a violation of the Act. This turns, in part, on whether a franchise relationship existed at the time of the events complained of. Koylum's complaint asserts, in part, that the PMPA was violated when Peksen and Ocean sought to terminate their arrangement with Koylum, and Peksen petitioned to oust Koylum from its tenancy. These events occurred in early October 1998, months before Ocean rejected the executory Supply Agreement in the bankruptcy court and Coastal ceased to provide gas to Ocean. The facts asserted in Koylum's complaint, relating to the time prior to Ocean's rejection of the Supply Agreement and Coastal's termination of the Ocean's right to use its marks, properly allege an unjustified termination of a franchise under either § 2801(1)(A)(iv) or § 2801(1)(B)(i). We conclude that Koylum properly pleaded a federal question. See 28 U.S.C. § 1331.
 
 
 54
 Our holding that the complaint properly invokes the court's jurisdiction under the Act should not be understood to suggest that plaintiff is necessarily entitled to the relief it seeks if it proves the facts alleged. The district court might ultimately conclude, if Koylum is seeking to perpetuate only a lease and not a franchise involving use of any franchised mark, that it is not entitled to take advantage of the Act's provision for a right of first refusal to acquire the premises. We express no view on the question, leaving it entirely to the district court in the first instance. The question now before us, however, is not whether the district court should ultimately grant any or all of the relief the plaintiff seeks, but whether Koylum's complaint asserts a claim under the PMPA. It does.
 
 
 55
 II. Whether the Grant of a Preliminary Injunction Was an Abuse of Discretion
 
 
 56
 A. The Preliminary Injunction Standard Under the PMPA
 
 
 57
 The PMPA directs a district court to enter a preliminary injunction if:
 
 
 58
 (A) the franchisee shows--
 
 
 59
 (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
 
 
 60
 (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
 
 
 61
 (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.
 
 
 62
 15 U.S.C. § 2805(b)(2). We have understood this language to place a lighter burden on a franchisee seeking preliminary equitable relief than the standard used for a traditional preliminary injunction. See Nassau Boulevard Shell Service v. Shell Oil Co., 875 F.2d 359, 363 (2d Cir. 1989) (stating that under the PMPA, "[a] franchisee's burden of proof... is less severe than is generally required" (citation and internal quotation marks omitted)); Wisser Company v. Mobil Oil Corp., 730 F.2d 54, 56 (2d Cir. 1984) ("[I]t is easier for a franchisee to obtain a preliminary injunction under the PMPA than in the usual case....").
 
 B. Appellants' Arguments
 
 63
 1. Preliminary Injunction and Continuation of the Franchise
 
 
 64
 Appellants argue that grant of a preliminary injunction was inappropriate because the purpose of a preliminary injunction under the PMPA is to maintain the franchise relationship pending the outcome of litigation. In their view, because the preliminary equitable relief sought by Koylum was to enjoin the prosecution of the state court holdover or nonpayment proceedings, not to maintain the franchise relationship, the lenient standard under the PMPA should not apply. We do not agree. The complaint alleges a violation of the Act and claims as a remedy under the Act a right of first refusal to purchase the premises. While the fact that Coastal has ceased to authorize Ocean to use its trademark undoubtedly threatens Koylum's ability to re-establish or continue a franchise involving Coastal's mark, the situation is not so clear as to rule out a preliminary injunction to preserve the status quo. District courts of course enjoy broad discretion in fashioning temporary equitable remedies, especially under the PMPA's lenient standard. See King v. Innovation Books, 976 F.2d 824, 828 (2d Cir. 1992) (reviewing grant of preliminary injunction for abuse of discretion); American Hosp. Supply Corp. v. Hosp. Prods. Ltd., 780 F.2d 589, 594-95 (7th Cir. 1986) (reviewing district court's grant of preliminary injunction with "substantial deference" and stating that court of appeals will reverse only where there exists "a strong conviction that [the district judge] exceeded the permissible bounds of judgment"); Wisser, 730 F.2d at 56 (noting that "it is easier for a franchisee to obtain a preliminary injunction under the PMPA than in the usual case").
 
 
 65
 2. Whether Koylum's Failure to Request Relief Under the PMPA Until After the Sale of the Premises Prejudiced Peksen and 1677 Ridge
 
 
 66
 Appellants argue that, regardless of the standard for preliminary injunction that applies, Koylum's delay in seeking injunctive relief upon receipt of the termination notices severely prejudiced Peksen and 1677 Ridge. Their argument is essentially that Koylum's removal of the Coastal signs and its failure to seek a preliminary injunction under the PMPA immediately after receiving the termination notices led appellants to "rely on the validity of those termination notices" in their decision to enter into a sales contract for the station premises. Therefore, they contend, the entry of preliminary equitable relief was an abuse of discretion.
 
 
 67
 We disagree. Koylum's failure to seek a preliminary injunction until after the sale of the premises was attributable, at least in part, to the fact that appellants did not notify Koylum of that sale until the day the sale was completed. Moreover, immediately after the October 1998 termination notices, Koylum and Ocean/Peksen became involved in state court litigation contesting their rights under the Supply and Lease Agreements. Peksen cannot claim that it had no notice that Koylum contested the termination of its lease or the misbranding claim underlying that termination. 1677 Ridge is likewise unable to show that it was prejudiced. The magistrate judge found that 1677 Ridge, whose proprietor operates at least one Coastal petroleum distribution business, purchased the station premises despite its full awareness of the ongoing dispute between Peksen and Koylum concerning the sale of unbranded gasoline. Also, the magistrate judge properly found that 1677 Ridge has made no showing that it is being harmed by the temporary injunction.
 
 
 68
 3. Whether Koylum's Alleged Misbranding Makes Preliminary Injunctive Relief Inappropriate
 
 
 69
 Appellants also contend that Koylum's sale of unbranded gasoline as Coastal gasoline is a fraud on the public justifying immediate termination, and that the district court should not have construed the Rider to allow such a practice.
 
 
 70
 Under the PMPA, a franchisor is permitted to terminate a franchise relationship on several grounds, including
 
 
 71
 [a] failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship....
 
 
 72
 15 U.S.C. § 2802(b)(2)(A). Termination is also reasonable upon the occurrence of "an event which is relevant to the franchise relationship," including "willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee." Id. § 2802(c)(10).
 
 
 73
 In Wisser v. Mobil Oil, 730 F.2d 54 (2d Cir. 1984), we affirmed the district court's refusal of a preliminary injunction that would have prevented Mobil, the trademark holder and franchisor, from terminating the franchise. Mobil justified the termination on the ground that the franchisee intentionally misbranded gasoline. The franchisee denied it had misbranded gasoline, but the evidence confirmed it had done so. Such conduct, we held, was grounds for termination because it constituted a violation of a provision of the franchise contract that was "both `reasonable' and `material' within the meaning of 15 U.S.C. § 2802(b)(2)(A)" and because it is specifically identified in the statute as justifying termination of the franchise. Id. at 57. We were not considering a contention that the sale of unbranded gasoline would not violate the terms of the franchise.
 
 
 74
 Appellants' reliance on Wisser is misplaced. Here, Koylum claims that, for at least three reasons, its purchase of unbranded gasoline for sale under the Coastal mark was not a violation of the terms of its agreements. First, the Rider to the Supply Agreement arguably contemplated that Koylum might purchase unbranded gasoline. Second, Ocean itself had delivered unbranded gasoline to Koylum for sale under the Coastal mark. Third, Koylum claims that Ocean's failure to perform its own obligations under the Supply Agreement and Rider further freed Koylum to acquire gasoline from independent sources. In Wisser, there was a single issue of disputed fact--whether the franchisee had secretly sold unbranded gasoline under the Mobil trademark--and the evidence supported the district court's conclusion that it had. Here, it is undisputed that Koylum sold unbranded gasoline, but the issue is whether such sales violated its agreements. The issue is completely different.
 
 
 75
 Nor is it clear that Koylum's actions constitute "willful adulteration, mislabeling or misbranding" within the meaning of § 2802(c)(10). Whether conduct falls within those terms of the statute depends entirely on the terms of the pertinent franchise agreements. Section 2802(c)(10) is satisfied by a voluntary action, "done either with an intentional disregard of, or plain indifference to, the requirements of the franchise agreement." Retsieg Corp. v. ARCO Petroleum Prods. Co., 870 F.2d 1495, 1498 (9th Cir. 1989). Here, as noted above, Koylum advances respectable arguments that its purchases of unbranded gasoline were permitted by the franchise agreement. Therefore, there are serious questions going to the merits of Koylum's contention that its actions violated neither the franchise agreements, nor the provisions of the Act. The grant of preliminary equitable relief was not an abuse of the district court's discretion.
 
 CONCLUSION
 
 76
 We affirm the district court's grant of a preliminary injunction.
 
 
 
 NOTES:
 
 
 [1]
 The PMPA generally makes it unlawful for a franchisor to "terminate any franchise... prior to the conclusion of the term, or the expiration date, stated in the franchise." 15 U.S.C. § 2802(a)(1). The statute provides, however, that a franchisor may terminate a franchise for, among other things, "[a] failure of the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." Id. § 2802(b)(2)(A).
 
 
 [2]
 "The term `contract' means any oral or written agreement." 15 U.S.C. § 2801(10).
 
 
 [3]
 The PMPA defines a "distributor" as:
 any person, including any affiliate of such person, who--
 (A) purchases motor fuel for sale, consignment, or distribution to another.
 15 U.S.C. § 2801(6).
 
 
 [4]
 Under the PMPA, oral and written agreements are contracts, and therefore the lack of a particular refiner's mark in the Supply Agreement does not take the agreement outside the requirements of the statute. See 15 U.S.C. § 2801(10) ("The term `contract' means any oral or written agreement.").