**Ralph E. NORBERG, Plaintiff,**

v.

**TILLAMOOK COUNTY CREAMERY ASSOCIATION, an Oregon Cooperative; et al., Defendants.**

**No. 98–909–JO.**

United States District Court,
D. Oregon.

Nov. 15, 1999.

Leonard D. DuBoff, Patty Rissberger, DuBoff & Ross, Portland, OR, for Plaintiff.

James C. Edmonds, Clark Lindauer Mcclinton Krueger & Fetherston, Salem, OR, for Defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

Plaintiff Ralph Norberg brings this action against defendants Tillamook County Creamery Association ("TCCA") and Ronald Hurliman, alleging a federal claim for disability discrimination under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and state law claims for disability discrimination, breach of the covenant of good faith and fair dealing, and intentional interference with business relations.

The case is now before the court on defendants' motion for summary judgment (# 25) on all claims. For the reasons stated, defendants' motion with respect to the disability discrimination claims is granted. The remaining state law claims are dismissed without prejudice.

## FACTUAL BACKGROUND

TCCA is a cooperative, wholly owned by its member dairy farmers. The members also own and operate a creamery plant in Tillamook, which produces milk and cheese products for sale nationwide.

Plaintiff worked for TCCA from at least 1950 until TCCA terminated his contract in January 1998. Since at least the 1970s, plaintiff has operated as a contract bulk milk hauler for TCCA. As a hauler, plaintiff would, among other tasks, go to the member-producers' dairy farms, pump the milk from their tanks onto his truck, and deliver the milk to the creamery for processing.

Over the years, plaintiff entered into a series of contracts with TCCA. Each contract describes plaintiff (the "hauler" or, in earlier years, the "carrier") as an independent contractor. The effect of that language and the issue of whether plaintiff was, in fact, an independent contractor are the primary focus of the pending motion. Consequently, the details of plaintiff's work and his relationship with TCCA will not be recited here, but are set forth below. During the relevant time, TCCA had seven contract milk haulers and two employees who also hauled milk.

At some point in late 1996 or early 1997, plaintiff, who operated as a corporation under the name Ralph Norberg Trucking Ltd., began negotiating the sale of his trucking business to his son-in-law, Ed Jones.[1] Plaintiff's plan was to retire from milk-hauling and to appoint Jones as the successor to his milk route. At some point, plaintiff and Jones reached an impasse in their negotiations. According to Jones, the impasse was over plaintiff's asking price, and negotiations terminated before any involvement by TCCA or Hurliman. Affidavit of Edward Jones, p. 2. Plaintiff, however, attributes the breakdown in negotiations to interference by TCCA and Hurliman, who, according to plaintiff, "told Ed Jones that he should not buy plaintiff's corporation and that he should not pay the price plaintiff was asking." Plaintiff's Response to Defendant's Motion, p. 3; Plaintiff's Concise Statement of Material Facts, ¶¶ 58–59.

In any event, after negotiations broke down, on March 14, 1997, plaintiff became aware of a medical condition that precluded driving a truck.[2] On March 30, 1997, plaintiff appointed Gene Widmer as his relief driver, to fill in during the period of disability. At about the same time, TCCA

---

1. Plaintiff characterizes the negotiations as "an agreement with Ed Jones * * * for the transfer of plaintiff's route," but the evidence cited does not support that characterization. *Compare* Deposition of Edward Jones, p. 31 (asking price of $300,000 was for the truck, as "[t]he routes are owned by the creamery"), with Plaintiff's Concise Statement of Material Facts, ¶ 56.

2. Plaintiff evidently experienced a "black out" on that date. Deposition of Ralph Norberg, p. 82.

learned that plaintiff had a health condition that restricted him from driving.

On March 26, 1997, the TCCA Board of Directors adopted a resolution calling for certain amendments to the milk haulers' contract. *See* Declaration of Robert Dorband, Exhibit 11. Among other things, the amendments (1) defined "hauler" in the case of a corporation to mean "the controlling owner of Hauler"; (2) required the hauler to "personally devote his time and attention to the performance of the services under this contract"; (3) prohibited sale of the route; (4) retained to TCCA the sole right, upon termination of the contract, to select a new hauler, to reallocate existing routes, or to "take any other action deemed desirable by TCCA"; and (5) added that "any sale or attempted sale of Hauler's milk hauling business or the route" would result in "immediate termination." Declaration of Robert Dorband, Exhibit 11. These changes were incorporated in a new haulers' contract plaintiff signed on April 22, 1997. *See* Declaration of Robert Dorband, Exhibit 2.

On July 17, 1997, plaintiff submitted to TCCA a letter from his physician stating that "due to health problems, I put Ralph Norberg on a medical leave of absence starting June 22, 1997," and "[i]t appears likely that this leave will extend at least through August 31, 1997." Declaration of Robert Dorband, Exhibit 3. The same day, TCCA's general manager, Harold Schild, mailed plaintiff a 180 day notice of intent to terminate the April 22, 1997, haulers' contract. Declaration of Robert Dorband, Exhibit 4. The reason, according to Schild's deposition testimony, was that plaintiff no longer was able to perform his duties as a contract hauler, had moved out of the area, and "it was time to move on." Deposition of Harold Schild, p. 119.[3]

At some point in time, plaintiff asked to meet with TCCA's Board to discuss his medical condition. The request was denied. Meanwhile, plaintiff and his relief driver, Gene Widmer, began discussing the possibility of Widmer buying plaintiff's truck. Deposition of Gene Widmer, p. 11.[4] Widmer approached TCCA about taking over plaintiff's route, but eventually learned that Ed Jones had been selected as the successor hauler. Deposition of Gene Widmer, pp. 21–22. Plaintiff's contract with TCCA terminated on January 15, 1998. Whether Ed Jones was selected before or after that date appears to be a disputed issue of fact. *Compare* Plaintiff's Concise Statement of Material Facts, ¶¶ 71–76, with Defendant's Concise Statement of Material Facts, ¶ F.21.

## STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v.*

---

**3.** The court is compelled to comment that both parties' concise statements of material fact tend to characterize, rather than objectively state, the evidence. *See, e.g.,* Defendants' Concise Statement of Material Fact, ¶ D.17; Plaintiff's Concise Statement of Material Facts, ¶ 63. This practice is not helpful to the court, and not in keeping with the local rules. *See generally* L.R. 56.1.

**4.** *See* footnote 3. Plaintiff claims that he entered into an agreement with Widmer

"whereby plaintiff would transfer his equipment and route to Widmer * * *." Plaintiff's Concise Statement of Material Facts, ¶ 70. Widmer's testimony, however, reveals that at most, he discussed buying plaintiff's truck if he could get a contract from TCCA: "They [TCCA] told me I couldn't get a contract, so that's as far as the negotiations went." Deposition of Gene Widmer, p. 11. Widmer further testified that he understood that he would have to get a contract from TCCA "to run the milk route." *Id.* at p. 12.

*Phelps Dodge,* 865 F.2d 1539, 1542 (9th Cir.1989).

The substantive law governing a claim determines whether a fact is material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *T.W. Elec. Service,* 809 F.2d at 631. Inferences drawn from facts are viewed in the light most favorable to the non-moving party. *Id.* at 630–31.

### DISCUSSION

1. *Plaintiff's Disability Discrimination Claims.*

Plaintiff asserts claims for disability discrimination against defendant TCCA under both the ADA and the equivalent state law, O.R.S. 659.436. Defendants argue that, at least for purposes of the present motion, both claims are subject to the same analysis, a point plaintiff does not dispute. Consequently, the following discussion applies to both claims.

TCCA's primary contention is that plaintiff was an independent contractor, not an employee, and is not subject to the ADA. *See Barnhart v. New York Life Ins. Co.,* 141 F.3d 1310, 1312 (9th Cir.1998)(Age Discrimination in Employment Act ("ADEA") applies to employees, not independent contractors). Plaintiff appears to concede the legal point, but argues that as a factual matter, he was TCCA's employee or that disputed issues of fact as to the nature of their relationship preclude summary judgment.

The parties disagree as to the appropriate test to apply in determining whether plaintiff was an employee or an independent contractor. TCCA argues in favor of the common-law agency test adopted for use in ADEA cases by the Ninth Circuit, *Barnhart, supra,* 141 F.3d at 1313, and for use in ERISA cases by the United States Supreme Court. *See Nationwide Mutual Ins. Co. v. Darden,* 503 U.S. 318, 323–24, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). Under that test, the court examines several equally weighted factors for the purpose of determining "the extent to which the hiring party controls 'the manner and means by which the product is accomplished.'" *Barnhart,* 141 F.3d at 1312 (*quoting Darden,* 503 U.S. at 323, 112 S.Ct. 1344). The factors include:

1) the skill required; 2) source of the instrumentalities and tools; 3) location of the work; 4) duration of the relationship between the parties; 5) whether the hiring party has the right to assign additional projects to the hired party; 6) the extent of the hired party's discretion over when and how long to work; 7) the method of payment; 8) the hired party's role in hiring and paying assistants; 9) whether the work is part of the regular business of the hiring party; 10) whether the hiring party is in business; 11) the provision of employment benefits; and 12) the tax treatment of the hired party.

*Barnhart,* 141 F.3d at 1312–13; *Darden,* 503 U.S. at 323–24, 112 S.Ct. 1344.

Plaintiff, in turn, argues that the appropriate test is the "economic realities" test set forth in *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 (9th Cir.1980). Under that test, the primary factor is the extent of the employer's right to control the means and manner of the worker's performance. *Lutcher,* 633 F.2d at 883. Other relevant factors under *Lutcher* include:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by

one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the work accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Lutcher,* 633 F.2d at 883 n. 5.

■ Defendants suggest that in *Barnhart,* the Ninth Circuit abandoned the *Lutcher* economic realities test in favor of the common-law agency test. That does not appear, however, to be the case. In *Adcock v. Chrysler Corp.,* 166 F.3d 1290 (9th Cir.1999), a Title VII case, the Ninth Circuit distinguished between cases that turn on the definition of "employee" and cases that turn on the nature of the parties' relationship—employment or independent contractual affiliation—and adhered to the *Lutcher* test for analyzing the latter issue. The court explained:

In *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), the Supreme Court held that whether an individual was an "employee" for purposes of an ERISA benefits claim was subject to an analysis of common law agency principles. The Court's holding applies to statutes that contain the term "employee" and do not otherwise define the term. * * * Title VII defines "employee" exactly as does ERISA. * * * The common law agency approach is essentially indistinguishable from the approach previously used by this Circuit in analyzing "employment relationship" for Title VII purposes. *See Loomis Cabinet [Co. v. Occupational Safety & Health Review Comm'n ],* 20 F.3d [938], 941–42 [ (9th Cir.1994) ]. However, because the precise question before this Court turns on whether the parties' agreement would have constituted an employment relationship, and not on the definition of employee, we rely on *Lutcher,* which specifically distinguished employment from independent contractual affiliation, * * * and was not abrogated by the common law approach to defining "employee" of *Darden.*

*Adcock,* 166 F.3d at 1292 n. 3· (citations omitted).

Because the issue in the present case is the nature of the parties' relationship, not the meaning of "employee" for purposes of the ADA, I understand *Adcock* to mean that the *Lutcher* test applies. In any event, however, I conclude that under either test, plaintiff was an independent contractor, not an employee of TCCA.

The following facts pertinent to the parties' relationship are undisputed:

a. Plaintiff worked for TCCA since at least 1950. Since 1970, plaintiff operated as a contract bulk milk hauler for TCCA.

b. Since 1970, all contracts between plaintiff and TCCA have contained a clause stating that plaintiff is an independent contractor.

c. Plaintiff operated as a corporation, Ralph Norberg Trucking, Ltd. ("RNTL"). Plaintiff was president of RNTL, and his wife was secretary. Money TCCA paid to RNTL for trucking services went into RNTL's checking account, which was separate from plaintiff's personal accounts.

d. RNTL owned the truck and tanker plaintiff used to haul milk. RNTL paid for all fuel, tires, repairs, maintenance, and liability insurance for the truck and trailer.

e. RNTL hired its own employees. Between 1990 and termination of plaintiff's contract, RNTL employed at least three employees other than plaintiff and his wife.

f. RNTL provided workers compensation insurance for its employees, paid their wages from its own account, and withheld the employees' social security, state and federal taxes. RNTL issued W–2 forms to its employees, including plaintiff and his wife. TCCA did not control whether or what amount RNTL paid its employees.

g. TCCA did not require plaintiff to account for the number of hours worked or to provide TCCA with time cards. TCCA did not control the timing or amount of

plaintiff's vacations. Plaintiff did not report RNTL's profits to TCCA, or show TCCA his books and records. TCCA did not prohibit plaintiff from working for others and did not issue him a W–2 form. RNTL was responsible for the health and retirement benefits of its employees, including plaintiff and his wife. TCCA, in contrast, provides these benefits for its own employees, including its employee drivers.

h. Plaintiff was responsible for obtaining and maintaining all of his own licensing and certification, including a PUC license and a milk sampling license. Plaintiff provided most of his own tools, equipment, and materials necessary for the job. Certain aspects of plaintiff's job were performed outside TCCA's plant.[5]

i. The contracts between TCCA and plaintiff allowed plaintiff to accept or reject loads of milk offered to him for hauling "at his election." TCCA paid plaintiff based upon pounds of milk hauled. In contrast, TCCA paid its employee haulers an hourly wage. Contract drivers are able to select and hire their own relief drivers or other employees to perform services for TCCA, and plaintiff employed various relief drivers to run his route since at least 1985. TCCA's employee drivers, in contrast, must drive their own routes and must follow all of the policies set forth in TCCA's employee handbook, which is not distributed to contract haulers. TCCA used employee drivers on two routes, both outside Tillamook County.

j. The contract between TCCA and plaintiff was terminable by either party without cause upon 180 days written notice. Upon termination of the contract, TCCA had "sole and absolute discretion" to solicit applications for a successor hauler, interview applicants, and enter into a contract for hauling services. The contract between the parties also prohibited

plaintiff's sale or assignment of the route, and provided the plaintiff waived "any claim to or interest in the route, and acknowledge[d] that the route ha[d] no value."

k. With respect to performance of the job itself, haulers are required to maintain sanitary conditions, to be licensed, to be careful in measuring the milk, taking samples, recording, data, keeping milk cold, and cleaning the farmers' bulk tanks after the milk is emptied. The haulers must also take a sample for an antibiotic test, which is required by the FDA.

l. TCCA distributed its Cooperative Member Handbook to the contract haulers. The handbook provides the following with respect to contract milk haulers:

1. TCCA will supply and maintain the TCCA logo and lettering on each hauler's truck.

2. TCCA offers some assistance for repairs due to extreme weather conditions.

3. General policies and procedures for handling and hauling the milk.

4. A statement that the attitude and appearance of the drivers is a "very important factor in maintaining healthy relationships with the producer, as well as regulatory personnel." *See* Declaration of Robert Dorband, Exhibit 6, pp. 9–12.

■ In view of the above undisputed facts, and applying the factors set forth in both *Barnhart* and *Lutcher, supra,* only two factors—the duration of the parties' relationship and whether the work is part of the regular business of the hiring party—weigh in favor of plaintiff. The remaining factors all weigh in favor of TCCA. Plaintiff contends, however, that notwithstanding the "economic reality" that his relationship with TCCA was that of an independent contractor, TCCA nonetheless had nearly "complete control" over

---

**5.** Plaintiff disputes defendants' statement that "[t]he hauling job takes place, for the most part, outside of TCCA's plant as haulers pick up milk at member-farmers' dairies, test it, wash the bulk milk tanks, and haul the milk,"

but the evidence supports defendants' statement. *Compare* Defendants' Concise Statement of Material Fact, ¶ 3, with Plaintiff's Concise Statement of Material Facts, ¶ 3.

his work duties. Plaintiff accuses TCCA of attempting to "have [its] cake and eat it, too" by considering him to be an independent contractor for purposes of cost savings but controlling him for purposes of his day to day duties. According to plaintiff, TCCA told him "what to do and how to do it," an assertion that plaintiff views as dispositive. *See* Plaintiff's Response to Defendants' Motion, pp. 8–9.

The evidence does not support plaintiff's contentions. For example, plaintiff asserts that "TCCA dictated his hours and routes" (Plaintiff's Response, p. 9), but the evidence plainly shows that his hours and the route he followed were "dictated," if at all, by the member-farmers' needs and schedules. Plaintiff's own testimony confirms this fact. *See* Deposition of Ralph Norberg, p. 34.

As another example, plaintiff asserts that "TCCA dictated his attitude and appearance" (*Id.*), a claim he supports only by reference to the statement contained in the Cooperative Members Handbook, quoted above, which does not support the inference of control that he urges.

Plaintiff also attempts to construct an inference of "right to control" from the fact that TCCA outlined, in the Cooperative Members Handbook, the basic procedural requirements of the bulk milk hauling job. Plaintiff invites the court to read a "right to control" into these basic policies and procedures, but in conjunction with the parties' contracts and the undisputed factual record set forth above, the only reasonable inference that can be drawn from the handbook is that it describes the job to be done, leaving the details of the means and manner of performance, *e.g.,* dress, hours, route, time off, benefits, wages, relief drivers, etc., to the hauler. Plaintiff's theory, in essence, would have the court find an employee relationship whenever the hiring party described the parameters of the job to be accomplished, an argument the court declines to accept.

I conclude that no reasonable factfinder could find from the undisputed evidence of record that plaintiff was TCCA's employee and not an independent contract. Accordingly, TCCA's motion for summary judgment on plaintiff's federal and state disability discrimination claims is granted.

2. *Plaintiff's Remaining State Law Claims.*

Federal jurisdiction in this case rests on plaintiff's ADA claim. 28 U.S.C. § 1331. Because summary judgment as to that claim and the equivalent state law claim is granted, I decline to retain jurisdiction to decide defendant's motion with respect to plaintiff's remaining supplemental state law claims. Accordingly, those claims are dismissed without prejudice.

### CONCLUSION

Defendants' motion for summary judgment (# 25) is granted with respect to plaintiff's first and fourth claims for relief in the Amended Complaint. Plaintiff's remaining claims are dismissed without prejudice. Any other pending motions are denied as moot.